642 So.2d 999 (1993)
Harold Guy HUNT
v.
STATE.
CR 92-1300.
Court of Criminal Appeals of Alabama.
December 13, 1993.
As Modified on Denial of Rehearing January 12, 1994.
*1002 George Beck and Terry Travis, Montgomery, John Mark McDaniel, Huntsville, and William N. Clark, Birmingham, for appellant.
James H. Evans, Atty. Gen., and Rosa H. Davis, David Bjurberg, and Stephen P. Feaga, Asst. Attys. Gen., for appellee.
PER CURIAM.[1]
Harold Guy Hunt, the Governor of the State of Alabama, was indicted and convicted for using his office for direct personal financial gain in violation of Ala.Code 1975, § 36-25-5 of the Alabama Ethics Law. His sentence of five years' imprisonment was suspended upon the condition that he perform 1,000 hours of community service. This is the direct appeal from that conviction.

STATEMENT OF THE CASE
The Alabama Ethics Commission, after investigation, found probable cause to believe that Hunt had violated the State Ethics Law. The Commission sent its findings to the Alabama Attorney General for further proceedings on September 20, 1991, pursuant to Ala.Code 1975, § 36-25-4(8). Hunt, in his official capacity as governor, secured legal counsel. He initiated legal proceeding in the Federal District Court for the Middle District of Alabama in which he requested the court to stop any proceedings against him on the ground that he was not subject to the state ethics law because he was the chief executive of the state. The federal district court denied relief on October 30, 1991. Hunt v. Anderson, 794 F.Supp. 1557 (M.D.Ala.1992). Hunt appealed that decision to the United States Circuit Court of Appeals for the Eleventh Circuit. The Eleventh Circuit Court of Appeals affirmed the ruling of the federal district court on September 30, 1992. Hunt v. Anderson, 976 F.2d 744 (11th Cir.1992).
While the appeal from the ruling of the federal district court was pending, a state grand jury was convened in June 1992 in Montgomery County by the Attorney General, to investigate Hunt's financial transactions. During the course of the investigation, the grand jury subpoenaed financial records of Hunt and members of his family. In response to motion, filed by Hunt, the Circuit Court of Montgomery County ruled that the *1003 grand jury had a right to examine Hunt's financial records. Hunt appealed that ruling. After hearing oral arguments, this court denied the petition without opinion, thereby allowing the ruling of the trial court to stand. Ex parte Hunt, 617 So.2d 703 (Ala.Cr.App. 1992).
On December 28, 1992, the grand jury indicted Hunt. Count I of the indictment charged Hunt with a violation of the State Ethics Law which prohibits an elected official from using his office for direct personal financial gain. The remaining 12 counts of the indictment were dismissed by the circuit court based on the statute of limitations.
The trial began with jury selection proceedings on April 12, 1993. The trial concluded on April 22, 1993, when the jury returned a verdict of guilty as charged in count one of the indictment. Hunt was sentenced on May 7, 1993. He filed a motion for a new trial which was denied on June 23, 1993. Notice of appeal was filed. The completed record of the circuit court proceedings was filed with this court on July 6, 1993. Oral arguments were heard on September 8, 1993. This case was officially submitted to this court on that date.
Appeal to this court is an absolute right. Section 12-3-11, Code of Alabama 1975, provides:
"Each of the courts of appeals shall have and exercise original jurisdiction in the issuance and determination of writs of quo warranto and mandamus in relation to matters in which said court has appellate jurisdiction. Each court shall have authority of grant injunctions and issue writs of habeas corpus and such other remedial and original writs as are necessary to give it a general superintendence and control of jurisdiction inferior to it and in matters over which it has exclusive appellate jurisdiction and to punish for contempt by the infliction of a fine not exceeding $100.00 and imprisonment not exceeding 10 days, or both, and to exercise such other powers as may be given to such court by law."
Section 12-3-9, Code of Alabama 1975 states in pertinent part:
"The court of criminal appeals shall have exclusive appellate jurisdiction of ... all felonies...."
Any appeal to the Alabama Supreme Court of this court's ruling affirming Hunt's conviction is in the nature of discretionary review. Ala.Code 1975, § 12-2-2. See Cunningham v. State, 611 So.2d 510 (Ala.Cr.App.1992).

I. SELECTIVE PROSECUTION
Hunt initially argues that the trial court committed reversible error by failing to dismiss the indictment on the grounds that he was selectively prosecuted in violation of his constitutional rights. Hunt's contention is based on the guarantee in the Fourteenth Amendment of the United States Constitution which states in part that no person shall be denied "the equal protection of the law." Hunt contends that the equal protection clause was violated by his selective prosecution and that "he and the people of the state were denied equal access to justice."
In 1886 the principle that equal protection of the law is denied when a law is arbitrarily enforced was applied in the United States Supreme Court case of Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). This principle was reaffirmed by the United States Supreme Court in Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944) and Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).
Yick Wo, a native of China, appealed the enforcement of a San Francisco ordinance which stated that all owners of laundries built of wood had to obtain consent from a board of supervisors before they were allowed to continue to operate. Yick Wo, who had operated his "wooden laundry" for 22 years, sought consent of the board. Approval was denied and Yick Wo appealed that ruling. He presented evidence that there were 320 laundries in San Francisco, that 240 of those were operated and owned by natives of China, and that a total of 310 were made of wood. Yick Wo and more than 150 of his countrymen were arrested for similar violations. The United States Supreme Court, in holding that Yick Wo was discriminated against, stated the following:

*1004 "The fact of this discrimination is admitted. No reason for it is shown, and the conclusion cannot be resisted, that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which in the eye of the law is not justified. The discrimination is, therefore, illegal, and the public administration which enforces it is a denial of the equal protection of the laws and a violation of the Fourteenth Amendment of the Constitution."
118 U.S. at 374, 6 S.Ct. at 1073, 30 L.Ed. at 228.
Discriminatory enforcement or prosecution must be "purposeful." Snowden v. Hughes, supra. In Oyler v. Boles, the United States Supreme Court further stated that the selectivity must be "based upon an unjustifiable standard such as race, religion, or other arbitrary classification." 368 U.S. at 456, 82 S.Ct. at 506, 7 L.Ed.2d at 453. "[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." Oyler v. Boles, 368 U.S. at 456, 82 S.Ct. at 506, 7 L.Ed.2d at 453. See also 155 A.L.R. 1162 (1945). Though the United States Supreme Court has addressed the issue of discriminatory prosecution on several occasions, the exact elements of proof have been left to evolve on a case-by-case basis.
The Alabama courts have also dealt with this issue. In the case of Associated Industries of Alabama, Inc. v. State, 55 Ala. App. 277, 314 So.2d 879, cert. denied, 294 Ala. 281, 314 So.2d 901 (1975), the Alabama Court of Criminal Appeals adopted the holding in United States v. Steele, 461 F.2d 1148 (9th Cir.1972), and held that, initially, the party relying on the defense of discriminatory enforcement must first make a showing that a "strong inference of discriminatory prosecution exists." Once this showing has been made, it is up to the prosecuting agency to show that the "selection process actually rested upon some valid ground." Associated Industries, 314 So.2d at 890, quoting Steele, 461 F.2d at 1152.
To establish that a "strong inference of discriminatory prosecution exists" the party alleging such discrimination must show (1) selectivity in enforcement, (2) intentional selectivity, and (3) selectivity based on an unjustifiable standard. Elmore v. State, 445 So.2d 943 (Ala.Cr.App.1983); Coble v. City of Birmingham, 389 So.2d 527, 533 (Ala.Cr. App.), cert. denied, 389 So.2d 535 (Ala.1980); Starley v. City of Birmingham, 377 So.2d 1131 (Ala.Cr.App.), cert. denied, 377 So.2d 1134 (Ala.1979), cert. denied, 446 U.S. 956, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980). The party alleging discriminatory prosecution bears the burden of proof in establishing the claim. Robinson v. City of Birmingham, 353 So.2d 528 (Ala.Cr.App.), cert. denied, 353 So.2d 534 (Ala.1977), cert. denied, 436 U.S. 932, 98 S.Ct. 2833, 56 L.Ed.2d 777 (1978). See also Annot., What Constitutes Such Discriminatory Prosecution or Enforcement of Laws as to Provide Valid Defense in State Criminal Proceedings, 95 A.L.R.3d 280 (1980); Annot., Preconviction Procedure for Raising Contention that Enforcement of Penal Statute or Law is Unconstitutionally Discriminatory, 4 A.L.R.3d 404 (1965); 21A Am.Jur.2d § 831 and cases cited therein.
The United States Supreme Court has stated that:
"`so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.' Bordenkircher v. Hayes, 434 U.S. 357, 364[, 98 S.Ct. 663, 668, 54 L.Ed.2d 604, 611] (1978)....
"[A]lthough prosecutorial discretion is broad, it is not `"unfettered." Selectivity in the enforcement of criminal laws is ... subject to constitutional constraints.' United States v. Batchelder, 442 U.S. 114, 125[, 99 S.Ct. 2198, 2205, 60 L.Ed.2d 755, 765] (1979) (footnote omitted)."
Wayte v. United States, 470 U.S. 598, 607-08, 105 S.Ct. 1524, 1530-31, 84 L.Ed.2d 547, 556 (1985).
"[T]he burden resting upon the party seeking to prove unconstitutionally discriminatory enforcement of the law is a heavy one, and the cases involving claims of discriminatory enforcement are not clear as to what specific evidence will suffice to prove discrimination." *1005 4 A.L.R.3d at 410. The cases dealing with discriminatory enforcement are not entirely uniform. The Supreme Court of Nebraska adopted a hard test to meet when they held:
"To establish arbitrary discrimination inimical to constitutional equality, there must be more than an intentional and repeated failure to enforce legislation against others as it is sought to be enforced against the person claiming discrimination. Arrigo v. City of Lincoln, 154 Neb. 537, 48 N.W.2d 643 (1951). There must be more than a showing that a law or ordinance has not been enforced against others or that it is sought to be enforced against the person claiming discrimination. City of Omaha v. Lewis & Smith Drug Co., Inc., 156 Neb. 650, 57 N.W.2d 269 (1953). A finding of unlawful selective enforcement must be based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)."
State v. Long, 206 Neb. 446, 293 N.W.2d 391, 394 (1980).
In reaching that finding, the Nebraska court relied on federal cases which stated:
"To support a defense of selective or discriminatory prosecution, the defendant must show not only that others similarly situated have not been prosecuted, but that the selection of the defendant for prosecution has been invidious or in bad faith, based upon considerations such as race, religion, or the desire to prevent his exercise of his constitutional rights. United States v. Berrios, 501 F.2d 1207 (2d Cir.1974).
"A discriminatory purpose will not be presumed; there must be a showing of clear and intentional discrimination. Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944)."
Long, 293 N.W.2d at 394.
Evidence of discriminatory enforcement or prosecution "[m]ay consist of statistical evidence indicating prosecution based on some characteristic or characteristics irrelevant to law enforcement purposes, or of evidence indicating prosecution of only a very few of the many knowable violators of the law." Tinsley, Jimmie E., Discriminatory Enforcement of Criminal Law, 13 Am.Jur.Proof of Facts 2d 609, 631 (1977).
Courts have found that the following reasons do not involve unconstitutional prosecution: prosecuting a person who is publicly prominent, Commonwealth v. Beneficial Finance Co., 360 Mass. 188, 275 N.E.2d 33, cert. denied, 407 U.S. 910, 92 S.Ct. 2433, 32 L.Ed.2d 683 (1972); prosecuting a person who conducts a certain type of business, Taylor v. City of Pine Bluff, 226 Ark. 309, 289 S.W.2d 679, cert. denied, 352 U.S. 894, 77 S.Ct. 125, 1 L.Ed.2d 85 (1956); and prosecuting a person based on the extent of his illegal activity, State v. Walker, 236 N.W.2d 292 (Iowa 1975).
Hunt relies on the case of Associated Industries, in which this court reversed the defendant's conviction on the premise that the political committee was singled out for prosecution in violation of the Fourteenth Amendment. The committee in Associated Industries was indicted for failing to file an expense report with the Secretary of State and for failing to include the names and addresses of the committee on advertisements published in newspapers. In that case it was proven that many political committees had violated the state's Corrupt Practices Act by failing to file expense accounts but that Associated Industries was the only group which was prosecuted. In Associated Industries this court stated that the defendants had presented evidence which created a strong inference of discriminatory prosecution and the state had failed to rebut that inference by showing that the prosecution was based on reasonable permissible grounds.
Here, Hunt adopts a two-step defense. His first contention is that he was charged with a violation of the Fair Campaign Practices Act, § 17-22A-23, Code of Alabama 1975, for personal use of "excess campaign funds." Second, he contends that the state did not prosecute other public office holders for their personal use of excess campaign funds. Specifically, Hunt contends that legislative candidates should have been prosecuted under the Fair Campaign Practices Act for misusing excess campaign funds. However, *1006 Hunt was not charged with violating the Fair Campaign Practices Act, and this case does not involve excess campaign funds. Those two facts are fundamental to an understanding of this case. While we recognize that Hunt had a definite trial strategy, Hunt was charged with using his public office to obtain a direct personal financial gain in violation of the State Ethics Law.
If the party alleging the discriminatory enforcement fails to make an initial showing of discriminatory enforcement, "[t]he presumption that a criminal prosecution is undertaken in good faith and in a nondiscriminatory manner, ... remains undisturbed" United States v. Niemiec, 611 F.2d 1207, 1209 (7th Cir.1980) (citation omitted). No evidence was presented or offered, or offer of proof made, to show that anyone else subject to the Ethics Law had done the acts with which Hunt was charged and convicted of doing. No one else had (1) caused to be set up a non-profit transition and inauguration corporation upon having been elected, (2) then had solicited and collected moneys for such entity and (3) then, through a series of banking transfers, had used the money for personal gain.
Hunt has proved not one element of "selective enforcement." We hold that his prosecution for violating the Alabama Ethics Law was not discriminatory or arbitrary and that it did not violate the Fourteenth Amendment of the United States Constitution.[2]

II. THE JURY CHARGE
Hunt contends that the trial court's instructions to the jury on the use of excess campaign funds amounted "to a directed verdict for the state" and constituted reversible error.
Again, we emphasize that Hunt was indicted for violating the Ethics Law, not for violating the Fair Campaign Practices Act for use of excess campaign funds. Count one of the indictment charged:
"The Grand Jury of said county charge that before the finding of this indictment Harold Guy Hunt, alias H. Guy Hunt, alias Guy Hunt whose name is otherwise unknown to the Grand Jury, while a public official or employee, to wit: the Governor of the State of Alabama, did use an official position or office, to wit: the Office of the Governor of the State of Alabama, to obtain direct personal financial gain, to wit: two hundred thousand dollars ($200,000) in lawful currency and/or coinage of the United States of America and/or checks, a better description of which is unknown to the Grand Jury, for himself or his family or any business with which he or a member of his family is associated, said use and gain not being specifically authorized by law in violation of Section 36-25-5 of the Code of Alabama, against the peace and dignity of the State of Alabama." R. 26 (emphasis added).
The indictment charges that Hunt violated the Ethics Law contained in § 36-25-5. This section states in part:
"(a) No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law."
Throughout the trial, defense counsel made numerous references to excess campaign funds. Hunt sought to characterize as "excess campaign funds" contributions made to a non-profit corporation after the election was over. Such references began in opening statements and in the course of the trial many such references to "excess campaign funds" were made by the defense. It appears that Hunt did everything possible to make "excess campaign funds" an issue in this case. The decision to so characterize those contributions and to treat this case as one involving a violation of the Fair Campaign Practices Act was a strategic decision by Hunt and his attorneys as part of the defense. It does not appear that any other defense was relinquished or waived by virtue of their pursuit of this defense.
*1007 For example, the following occurred during the testimony of the Director of the Ethics Commission, Mr. Melvin Cooper:
"Mr. Evans [Attorney General]: Judge, we're going to object.
"The Court: Let me ask a question. I don't know if it's on this point or not. I'm having trouble, I'm having some trouble here with a law that says that you can't use your office to receive direct personal gain and a law that says you can use excess campaign funds for any lawful purpose. How does that
"Mr. Beck [defense counsel]: We agree.
"The Court:how does that allowI don't understand how that allows somebody who is in office to take campaign funds and use them personally when the Ethics Act specifically makes that unlawful, and, therefore, it would be a lawful purpose. Now, is there something with my logic?
"Mr. Beck: No, sir. That's what we've argued from the beginning, Judge. That's it.
"Mr. Evans: No, sir.
"Mr. Beck: That's our case."
This approach to defending the case treating it as a Fair Campaign Practices Act violationcarried over in Hunt's appellate brief. This is the meaning of Hunt's statement in brief that the trial court's charge to the jury on excess campaign funds amounted "to a directed verdict for the state."
One of the principal issues in this case is whether the trial court erred to reversal in the instruction to the jury known in legal parlance as the "jury charge." We set out the charge verbatim and in its entirety in order to place the particular instruction in context. We have underlined that portion of the charge which Hunt claims amounted to a "directed verdict."
"Ladies and gentlemen, the closing arguments have been concluded and it is now my responsibility to charge you on the law. This case was brought to you by way of what we call an indictment, and the indictment alleges that Harold Guy Hunt, while a public official, to wit, the Governor of the State of Alabama, did use an official position or office, to wit, the office of Governor of the State of Alabama, to obtain direct personal financial gain, to wit, two hundred thousand dollars in lawful currency or coinage, a better description of which is unknown to the grand jury, for himself, or his family, or any business with which he or a member of his family is associated, said use and gain not being specifically authorized by law, in violation of Section 36-25-5 of the Code of Alabama, against the peace and dignity of the State of Alabama. The first thing that I would say to you, ladies and gentlemen, is that an indictment is in no way to be considered as evidence by you. An indictment is very simply the form or the mode or the procedure through which a case gets into Court so that twelve jurors may be selected and determine the merits of the case. The indictment does, however, tell us what the charge is so that I will know what to charge you, and, therefore, then you will know what the law is that this case is being prosecuted under and you'll know the elements which must be proved beyond a reasonable doubt before a verdict of guilt would be warranted.
"Title 36, Chapter 25 and various Sections thereof is a body of law that relates to the conduct of public officials and employees of the State of Alabama, and is known in its short form as the Alabama Ethics Law. Title 36-25, Section 2 of that section of the Ethics Act reads as follows: Section (a): It is essential to the proper operation of democratic government that public officials be independent and impartial; that governmental decisions and policy be made in the proper channels of the governmental structure; that public office not be used for private gain other than the remuneration provided by law; and that there be public confidence in the integrity of government. The attainment of one or more of these ends is impaired whenever there exists a conflict between the private interests of an elected official or a government employee and his duties as such. The public interest, therefore, requires that the law protect against such conflicts of interest and establish appropriate ethical standards with respect to the conduct *1008 of elected officials and government employees in situations where conflicts exist.
"It is also essential to the proper operation of government that those best qualified be encouraged to serve the government. Accordingly, legal safeguards against conflicts of interest must be so designed as not unnecessarily or unreasonably to impede the recruitment and retention by the government of those men and women who are best qualified to serve it. An essential principle underlying the staffing of our government structure is that its elected officials and employees should not be denied the opportunity, available to all other citizens, to acquire and retain private economic and other interests, except where conflicts with the responsibility of such elected officials and employees to the public cannot be avoided.
"Section 5, Title 36, Chapter 25 of the Alabama Ethics Act is the Section under which this indictment is brought. Section 5 reads as follows: The Act provides in its pertinent part that, and I quote: No public official shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law. The Act further provides that any person who knowingly or willfully violates any of its provisions is subject to certain penalties. In order to find the Defendant guilty in this case, you must be convinced, beyond a reasonable doubt, from the evidence that the Defendant either knowingly or willfully used his official position or his office to obtain direct personal financial gain for himself, or his family. Therefore, the prosecution must prove beyond a reasonable doubt each and every element of the Act as follows, to wit: One, that the Defendant was a public official; two, that the Defendant used his official position or office; three, that by using his official position or office he obtained direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated; four, that such gain was not authorized by law; and, five, that the Defendant knowingly or willfully violated this provision. The word knowingly means that the act was done voluntarily and intentionally and not because of mistake or accident. A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of that nature or that the circumstance exists. Willfully. A person acts willfully when he acts voluntarily. A person acts willfully when the act was committed voluntarily and purposefully with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law. The term willfully is defined and means intentional as opposed to accidental or involuntary. Intent, being a state of mind, is rarely, if ever, susceptible of direct or positive proof and must usually be inferred from the facts testified to by witnesses in the circumstances as developed by and through the evidence. To convict, the State, in addition to the elements of the crime charged, must prove beyond a reasonable doubt that at the time of the commission of the alleged crime the Defendant was not acting under a mistaken belief either of fact, which would negate the culpable mental state required for the commission of the crime; or, mistaken belief of fact which supports the Defense of justification; or, mistaken belief founded upon an official statement of law contained in a statute that such conduct, as a matter of law, did not constitute a crime; or, a mistaken belief of law which is relevant to disprove the specific state of mental culpability required by the statute under which he is being prosecuted. The Defendant's mistaken belief of law must be other than as to the existence or meaning of the statute under which he is being prosecuted. Definition of public official. The term public official means any person elected to public office by the vote of the people of the state, county, or municipal level of government or their instrumentalities, and any person appointed to a position at the state, county, municipal level of government or that instrumentality. The term public official's family means the official's spouse and dependents. Of business, under *1009 the Ethics Act, means any corporation, partnership, proprietorship, firm, enterprise, franchise, association, organization, self-employed individual and any other legal entity. The term business with which he is associated, under the provisions of the Ethics Act, means any business of which the person or a member of his family is an officer, owner, partner, employee or holder of more than ten percent of the fair market value of such business. The law defines obtains as, in relation to property, to bring about a transfer or purported transfer of a legally recognized interest in the property for direct personal financial gain for himself or family.
"I charge you further that the amount of any direct personal financial gain is not an element of the offense charged, and strict proof of the amount alleged in the indictment is not required. As to the amount, the State need only prove beyond a reasonable doubt that the Defendant obtained some direct personal financial gain.
"There is the law called the Fair Campaign Practices Act. That law provides that a committee, a political committee, shall maintain a checking account and shall deposit any contributions received by such committee into such account. No expenditure of funds may be made by any such committee except by check drawn on such account or out of a petty cash fund from which it may make expenditures, not in excess of one hundred dollars to any person in connection with a single purchase or transaction. The Fair Campaign Practices Act became effective July the 1st, 1988. This Act says the following in regard to the use of excess campaign contributions. Amounts received by a principal campaign committee as contributions that are in excess of any amount necessary to defray expenses of the candidate represented by such committee, may be used by such candidate to defray any ordinary and necessary expenses incurred by him or her in connection with his or her duties as a holder of office, may be contributed by him or her to any organization described in the title, may be transferred to another political committee, or may be used for any other lawful purpose. The Court would charge the jury that it is not unlawful to use excess campaign funds to defray any ordinary and necessary expenses incurred by the Defendant in connection with any duties as a holder of office. I would further charge this jury that it is not unlawful to use excess campaign funds to reimburse old or new campaign debts, or the interest on the said debts where the debts were incurred for and connected to campaign expenses. The Court would further charge the jury that the Alabama Ethics Act provides that no public official shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated, unless such use and gain are specifically authorized by law. The use of excess campaign funds for direct personal financial gain is, therefore, not a lawful purpose as that phrase is used in the Fair Campaign Practices Act. [Emphasis added].
"The law of Alabama further requires that each state official earning more than twenty-five thousand dollars per year from his state employment to file a Statement of Economic Interest listing total combined family income from salaries, fees, dividends, profits, commissions, and other compensation from any business doing business in Alabama, or any other source of income, except that an elected official is not required by law to list as income any monies received and used for the repayment of debt or repayment of interest on debt incurred as the result of past or present election campaigns.
"Now, to this charge this Defendant has pled not guilty, and under our system, immediately upon a plea of not guilty the burden of proof is placed upon the State of Alabama, by and through its representatives, to prove a Defendant's guilt beyond a reasonable doubt. A Defendant is presumed innocent. The State has the burden of proving the guilt of the Defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The burden is never on the Defendant to prove his innocence or disprove the facts necessary to establish a crime of *1010 which he is charged; so it's important at the outset for us to try to understand, and right now let's make sure that you understand what the burden of proof is, what you're to look at, what is your responsibility when considering the evidence in this case to make a determination whether or not the elements of this offense have been proved beyond a reasonable doubt.
"The beyond a reasonable doubt phrase is a measuring stick in the law, in our criminal law, which is given to you, the jury, that you are to take and place upon the evidence to determine whether or not the burden of proof has been met in this case, so it's important that you gain as much of an understanding as is absolutely possible what that phrase meansbeyond a reasonable doubt. The first thing I would say to you about that phrase is that it means exactly what it says. It has its ordinary and everyday meaning. Beyond a reasonable doubt. Perhaps it has a lot more importance here in the courtroom, here in a criminal case, than in many other matters of life, but it means what it says. A reasonable doubt is a fair doubt based upon reason and common sense and arising from the state of the evidence. While it is rarely possible to prove anything to an absolute certainty, suspicion or conjecture will not rise to meet the standard of reasonable doubt. A reasonable doubt may arise not only from the evidence produced, but also from the lack of evidence or any part of the evidence. The burden is upon the State to prove the Defendant guilty beyond a reasonable doubt of every essential element of the crime charged. A Defendant has the right to rely upon the failure of the prosecution to establish such proof. A Defendant may also rely upon evidence brought out on cross-examination of witnesses for the prosecution and upon evidence presented on behalf of the Defendant. The law never imposes upon a Defendant in a criminal case the burden or duty of producing any evidence.
"The doubt which would justify an acquittal must be an actual doubt. It's not some mere speculation, conjecture, guess, or surmise and it's not a forced or capricious doubt. If, after considering all the evidence in this case, you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt and it would be your duty to convict the Defendant. The reasonable doubt which entitles an accused to an acquittal is not some mere fanciful, vague, conjectural or speculative doubt; but it's a reasonable doubt arising from the evidence or lack of evidence or any part of the evidence and remaining after you've given careful consideration of all the testimony, all of the evidence in the case, and you should do that just as any reasonable, fair-minded, conscientious man or woman would do or entertain under all the circumstances. You will observe that it is not the State's burden to prove a Defendant's guilt beyond all doubt or to some mathematical certainty, but simply beyond a reasonable doubt. If, after comparing and considering all the evidence in this case, lack of evidence of any part of the evidence, your minds are left in such a condition that you cannot say that you have an abiding conviction of the truth of the charge, then you are not convinced beyond a reasonable doubt and it would be your duty to find the Defendant not guilty.
"In coming before you on his plea of not guilty, each Defendant is presumed to be innocent, to be innocent of the charge against him. This presumption of innocence remains with the Defendant throughout every stage of the trial and even during your deliberations of the verdict and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that he's guilty. The presumption of innocence of the Defendant is evidence in the case which must be considered along with all the other evidence and is not to be disregarded by you. The presumption of innocence alone is sufficient to find a Defendant not guilty unless you are satisfied beyond a reasonable doubt of the Defendant's guilt from all the evidence in the case.
"A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable *1011 doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. If you are convinced that the Defendant has been proved guilty beyond a reasonable doubt then say so. If you are not so convinced then say so. A reasonable doubt may arise not only from the evidence produced, but also from lack of evidence. The burden is on the State to prove the Defendant guilty beyond a reasonable doubt of every essential element of the crime charged. The Defendant has a right to rely upon evidence brought out on cross-examination of witnesses, but the burden of proof never shifts to the Defendant in the case. If you believe that the evidence in this case did nothing more than create a suspicion, a possibility, speculation or a guess that the Defendant is guilty of the criminal act with which he is charged, then that is an insufficient basis for a conviction. Circumstances merely causing a suspicion of guilt are insufficient to justify a conviction of a crime and then, therefore, you would have to find him not guilty.
"If you believe from the evidence there is any reasonable theory of innocence on this case, then you must find the Defendant not guilty. The evidence in this case against the Defendant must exclude to a moral certainty every reasonable hypothesis except that of guilt, and no matter how strong the circumstances are, if they can be reasonably reconciled with the theory that the Defendant is innocent or not guilty then you should find the Defendant not guilty. Once again, if you have been convinced beyond a reasonable doubt of the guilt of the Defendant by and through the evidence, then there let your verdict stand. If you have not been so convinced, then find him not guilty.
"Now, we've talked about reasonable doubt and what that means. We've talked about the fact that that is the measuring stick that you are to take and apply to the evidence to determine, based on the evidence, whether or not you've been convinced of guilt in this case, so let me try to make absolutely sure that you are certain what is evidence and what is not evidence. What you are to take that measuring stick and apply it to and what you are to not apply it to. First of all, let's take what's not evidence. I've already mentioned to you that the indictment itself is not evidence in the case. I've explained that it is simply the mode or the form or the procedure through which a case gets into Court and tells us what the official charge is, so the indictment is not evidence. What the lawyers have had to sayopening statements, closing arguments, objections made, statements made throughout the trialthose matters are not evidence in this case and you're not to consider them as such. Rulings of the Court are not evidence. Objection overruled, objection sustained, those rulings are based simply and solely on my understanding and knowledge of the legal principles involved. If any member of this jury thinks that they have, or if you've got some inference or think that this Court feels one way or another toward guilt or non-guilt in this case, you should disregard that right now. That is not my responsibility in these proceedings. That's your responsibility and yours alone as the jury, the finder of fact, the trier of the evidence in this case, so rulings of the Court are not evidence.
"Well, what is evidence? Testimony. Witnesses who have come into this courtroom and taken the stand, been sworn in and given testimony. They've answered questions that the lawyers have asked. That's evidence in this case for you to consider and consider the credibility thereof. Any exhibits that have been introduced into evidence, those matters are evidence for you to consider in this case. You are allowed, as reasonable men and women of good common sense, to draw inferences from the testimony, from the exhibits, and those reasonable inferences you may consider as evidence in the case. Another matter of evidence in this case I mentioned is the presumption of innocence. The presumption of innocence is a matter of evidence in this case and every criminal case, and it simply says, as I've already told you, that this Defendant came into this courtroom and he was and sits now presumed to *1012 be innocent. The presumption of innocence has been described as a cloak or a protective shield placed around an individual in our society who's charged with a criminal offense, protecting that individual from the government, from the State, from the kingthat's where it came fromand that presumption, that protection, remains with one charged with a criminal offense up and until and only if, only if, a jury of his peers determines his guilt beyond a reasonable doubt and to a moral certainty. Then and then only would that shield, that cloak, be stripped away, and then and then only would he stand before this Court and this jury guilty as charged. So the presumption of innocence is a matter of evidence.
"You've heard alluded to throughout this trial what is called circumstantial evidence. Circumstantial evidence is proof of certain facts and circumstances in a given case from which a jury may infer other connected facts which usually and reasonably follow according to the experience of reasonable people. That word reasonable goes throughout this charge, if you haven't noticed. The test of the sufficiency of circumstantial evidence is whether the circumstances as proved produce an abiding conviction to the exclusion of a reasonable doubt of the guilt of the Defendant, whether the circumstances are incapable of explanation upon any other reasonable hypothesis consistent with the Defendant's innocence. There should not be a conviction based on circumstantial evidence unless it excludes every other reasonable hypothesis other than that of the guilt of the accused. No matter how strong the circumstances are, if they can be reconciled with the theory that the Defendant is innocent, then the guilt of the accused is not shown by the full measure of proof the law requires and the Defendant would have to be acquitted.
"You will recall that the Court charged you during voir dire when we questioned each one of you individually that the State has the burden of proof and that the Defendant has no burden and the Defendant need not even testify and that if the Defendant did not testify you couldn't hold that against the Defendant. You may not consider or even discuss the fact that the Defendant did not take the stand in this case.
"As to the credibility of the witnesses. The credibility of a witness is solely for you, the jury, the fact finder, the trier of the evidence, the trier of the testimony, to decide. You should subject that testimony to the same scrutiny that you would subject any important conversation or act. The mere fact that a witness was called by one side or the other or has an official title does not entitle such witness' testimony to more weight or credence than any other witness. The law says that in determining credibility of witnesses that you are to take all of the witnesses' testimony and to try to attempt to make it all speak the truth; but the law goes further and says that if you find in your deliberations there are irreconcilable conflicts within the testimony, within the evidence, that then it is within your province and your province alone as the jury in this case to accept that part which you believe to be true and disregard that part which you believe to be false. Even within the testimony of a single witness, if you believe that a witness has testified to you falsely on any material point then you may disregard all of that witness' testimony, or you may accept that part which you believe to be true and disregard that part which you believe to be false.
"Now, there are some tools that you may want to look to in helping you to determine the credibility of certain testimony. You may want to look to see, based on all the surrounding facts and circumstances of the case, whether or not a witness has exhibited any bias or prejudice or special interest in the case. If so or if not, that's one tool to take and place upon that witness' testimony in helping you to determine credibility. You may want to look to the demeanor of the witness. Now, demeanor is not a word to be frightened of, it very simply means how did they look, how did they act. Were they easy or uneasy, willing or unwilling? The witness chair is over here, the courtroom is built this way for a reason. *1013 The witness chair is over there by you so that you, the jury, the trier of fact, the one who must determine the credibility of the witness, might closely observe that witness when or she (sic) gives their testimony. Let me give you an example of demeanor. Probably one of the best examples, any of you folks that have children, when they come in talking to mamma or daddy, you look at how they're telling you as much as what's coming out of their mouth. That's demeanor. And in your everyday life, in your dealing with family and friends and business associates, you, without even thinking about it, use demeanor. Is this person telling me something that I can act on? That's just another tool that we all use and you can use it here.
"Another one is to test and see whether or not a witness actually had the opportunity to know, see or hear, whatever they've told you they knew, saw or heard. Based on all the surrounding facts and circumstances, did they actually have the opportunity to know, see or hear what they told you. And finally and last, but certainly not least, is your good common sense. Don't leave your common sense out here when you go back into the jury room to deliberate. You know, common sense is something that all of us, hopefully, are born with some of it. Sometimes I wonder, but hopefully we all are. And then as we are in this walk of life, we build on our common sense, our knowledge of men and their affairs. And as I look at this jury, I look at twelve different people, you come from twelve different walks of life and, therefore, when you go back into the jury room very shortly, you take your own common sense with you and apply it to this case and then put your common sense together with your twelve fellow jurors' common senses all to one end, helping you to decide what really happened. What is the truth of this matter?
"I've noticed that throughout the trial some of you folks have been taking notes, and that's okay, that's the reason I allowed it. You are permitted to take such notes with you into the deliberation room; however, I would caution you that no greater weight is to be given a juror with notes than one without. A specific juror's notes are to be used to refresh his or her own recollection of the evidence and are not to be used for the purpose of refreshing other jurors' recollections.
"Whatever your verdict is in this case it must be, must be, by law, unanimous. That means all twelve have to agree. Whether your verdict be one for guilt, all twelve would have to agree; or if your verdict be one for non-guilt all twelve would have to agree. Tell Ms. Baker I need two forms. Unanimous means everyone has to agree. There are no provisions for a split jury verdict under the laws of the State of Alabama.
"Your first job, when you retire in just a moment, will be to select one among you to serve as foreperson of this jury. That person's responsibilities are, really, two fold: One, to help insure the orderly conduct of your deliberations; and, two, once you have reached a verdicteither not guilty or guiltyto select the appropriate verdict form and sign it as foreperson of the jury. There are only two possible verdicts in this case. They are either: We, the jury find the Defendant not guilty; or, we, the jury, find the Defendant guilty as charged.
"Now the last thing I want to say to you is this. We, in our society, hear this term justice used a lot. We read about it, we hear about it on TV, we hear people talk about it. Sometimes that term is used appropriately, and sometimes inappropriately. But if there ever was a place that true quality ought to be involved in, ought to be applied to, ought to be a part of everything that happens, it's in a criminal courtroom, in every criminal case, in this criminal case; and I say that to you for two reasons, both are of equal importance. The first is that this Defendant comes into this courtroom and his freedom is literally at stake. And I hope and I pray that any time one of us as individuals must sit and make decisions that affect another person's freedom, that involved in, that a part of, that applied to that process, is that true quality of justice. Second reason, and just *1014 as important as the first: The State of Alabama comes into this courtroom by and through their representatives and they bring this case before you, the jury, for under our system of criminal justice you are the only forum that the people have to look to for the enforcement of our laws. And without laws and without the just enforcement of those laws, none of us are free. When you go back in that jury room in just a moment, you put aside any bias, any prejudice, any sympathy, wherever it may lie. You put it aside and you reach down inside and you make a fair, honest, conscientious decisionwhat have I been convinced of beyond a reasonable doubt or what have I not been convinced of. If it's something you've been convinced of beyond a reasonable doubt, that becomes a fact and you determine what the facts, and then you take the law as I've just given it to you and you apply it to those facts and there you let your verdict stand without bias, without prejudice, without sympathy, whether it be one of guilt or non-guilt. And if you'll do that then we will have had justice under the law in this case.
"There is a matter of law required by law to be taken up and ruled on outside the presence of this jury before you retire. I'm going to ask for a brief moment if you will not begin your deliberations. I'm going to ask you to please step back in the jury room and I need to have a conference with my lawyers and I'll see y'all back in chambers for just a moment and then we'll be back shortly and I'll send you out to deliberate. Do not begin at this point in time. The jury only is in recess." R. 1520.
The only portion of the court's oral charge to the jury which Hunt specifically complains of is the one sentence we have emphasized in the text.
We find no merit to Hunt's contention that the trial court's oral charge constituted a directed verdict for the state for the following reasons.

A.
First, the trial court's instruction on the Fair Campaign Practices Act was a correct statement of the law. In reaching that conclusion we find that the funds in question in this case were solicited on behalf of a non-profit corporation, after Hunt had been elected, and so were not "excess campaign funds." Section 17-22A-7 of the Fair Campaign Practices Act states:
"Amounts received by a principal campaign committee as contributions that are in excess of any amount necessary to defray expenditures of the candidate represented by such committee, may be used by such candidate to defray any ordinary and necessary expenses incurred by him or her in connection with his or her duties as a holder of office, may be contributed by him or her to any organization described in section 170(c) of Title 26 of U.S.Code, may be transferred to another political committee or may be used for any other lawful purpose." (Emphasis added).
The Ethics Law, Ala.Code 1975, § 36-25-5 et seq., states that no public official shall use his office to obtain direct personal financial gain. The Fair Campaign Practices Act became law in 1988. The Alabama Ethics Law had been enacted 15 years earlier, in 1973, and was the first ethics law in the history of the state. Both of these laws have a similar provision which deals with their interpretation in relation to other laws. The Ethics Law states: "This chapter shall be construed in pari materia with other laws dealing with the subject matter hereof, and repeals all laws and parts of laws in conflict herewith." Ala.Code 1975, § 36-25-30. The Fair Campaign Practices Act states: "It is the intention of the legislature by the passage of this chapter that its provisions be construed in pari materia with other laws regulating political contributions, corporations, or political contributions by corporations." Ala.Code 1975, § 17-22A-23. "In pari materia" means that the laws "must be construed with reference to each other." Black's Law Dictionary 1115 (6th ed. 1990).
It is a fundamental principle of judicial statutory construction that statutes should be read and construed in such a way as to give meaning to each of them, and to reconcile them if reasonable to do so. Schaefers v. Apel, 295 Ala. 277, 328 So.2d 274 *1015 (1976). When reading the two statutes in pari materia, with reference to each other, as we must, we come to the inevitable conclusion that the trial court's charge was a correct statement of the law: using excess campaign funds for direct personal financial gain is a violation of the Ethics Law.
To support his position, Hunt relies on two opinions of the Attorney General. The Attorney General's opinion issued April 16, 1990, states, in pertinent part:
"This provision [The Fair Campaign Practices Act] specifically sets forth three ways in which excess funds may be lawfully used by a candidate and acknowledges that there may be other lawful ways in which the funds could be used.
"At present we are aware of one other way that funds may be used. The excess funds might be used as personal income by a candidate but he should consult the Alabama Revenue Department and the Internal Revenue Service. There may be other lawful purposes that we are unaware of; however, they must be reviewed on a case-by-case basis as they are presented."
The opinion of the Attorney General issued March 20, 1991, states in pertinent part:
"In a prior Opinion, this office stated that this provision (Ala.Code, § 17-22A-7), [The Fair Campaign Practices Act] specifically set forth three ways that excess political contributions may lawfully be used and acknowledged that there may be other lawful purposes. Opinion to Hon. Perry A. Hand, Secretary of State, under date of April 16, 1990. We also stated that one of those lawful purposes may include using excess funds as personal income by a candidate, assuming that the candidate complies with all state and federal tax laws. If the Legislature did not intend for candidates to use campaign funds as personal income that could have been prohibited by specific language in the Act. Accordingly, while we do not condone a candidate's personal use of excess campaign funds, the Legislature has not made such use unlawful."
However, opinions of the Attorney General are not law.
"[W]ritten opinions of the Attorney General are not controlling. They are merely advisory and, under the statute [36-15-19, Code of Alabama 1975] such opinions operate only to protect the officer to whom it is directed from liability because of any official act performed by such officer as directed or advised in such opinion."
Broadfoot v. State, 28 Ala.App. 260, 261, 182 So. 411 (1938). See also Holcombe v. Mobile County, 26 Ala.App. 151, 155 So. 638, cert. denied, 229 Ala. 77, 155 So. 640 (Ala.1934).
Furthermore, neither the 1990 or the 1991 opinion of the Attorney General were issued to Hunt. Both of the opinions were issued after the commission of the acts in this case. Hunt cannot seek refuge in those opinions because Hunt's actions occurred before those opinions were issued. There is simply no credence to the notion that Hunt acted in reliance on those opinions. Moreover, even had those opinions been issued before the occurrence of the conduct in this case, they would not constitute a defense. These referenced opinions issued by the Attorney General are concerned solely with the application of the Fair Campaign Practices Act. They do not even mention the Ethics Law. Further, the opinions are expressly limited to a "candidate" for office. The Fair Campaign Practices Act applies to "candidates." The Ethics Law is much broader and applies to all "public officials." At the times pertinent to this case, Hunt was a public official as defined in § 36-25-1(11). A public official is:
"Any person elected to public office by the vote of the people at state, county or municipal level of government...." (Emphasis added).
The Ethics Law applied to Hunt. Reading the Fair Campaign Practices Act and the Ethics Law together, we can reach no other conclusion except that which the court charged the jury: "Using excess campaign funds for direct personal financial gain is not a `lawful purpose.'"

B.
Second, the objected to portion of the trial court's charge did not address an issue in the case presented by either the indictment or by the state's evidence. Again, we emphasize *1016 that Hunt was charged with using his public office to obtain direct personal financial gain in violation of the Ethics Law, not for violating the Fair Campaign Practices Act.
"A trial court has broad discretion in formulating its jury instructions, provided they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986), citing United States v. Padilla-Martinez, 762 F.2d 942 (11th Cir.1985).
"`Generally, the sufficiency of instructions must be determined by the facts in each case. It is the object and office of instructions to define for the jury, and to direct their attention to, the legal principles which apply to govern the facts, proved or presumed, in the case; and hence the instructions, whether given by the court of its own motion or by request, should be full, clear, and explicit, giving to the jury all the law so far as it relates to the issues proved or claimed to be proved, if such issues are sustained by any evidence or by any legitimate inference therefrom, and giving it in such a manner that the jury may not be misled or fail to understand the real issues. Moreover, the instructions should be a safeguard of fairness and impartiality and a guaranty of judicial indifference to individuals.' (Footnotes omitted.)" 551 So.2d at 1115 (emphasis added).
Bui v. State, 551 So.2d 1094 (Ala.Cr.App. 1988), affirmed, 551 So.2d 1125 (Ala.1989), vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991).
Although the charge dealt with no issue contained in the indictment, it did address an issue generated by Hunt. In a criminal jury trial, if it is apparent that the accused is seeking to establish a certain defense, or to present evidence in mitigation or justification, it most often is the better part of wisdom for the judge to give a charge on that subject even if the judge is not convinced that the defense as presented mitigates or justifies the criminal conduct. "Instructions containing abstract propositions of law which are inapplicable to the issues or facts are not ground for reversal, unless the defendant may reasonably be regarded as having been prejudiced thereby." Traywick v. State, 378 So.2d 1196, 1197 (Ala.Cr.App. 1979). See also Mack v. State, 348 So.2d 524 (Ala.Cr.App.1977). "It is well established that the instruction `may not be judged in artificial isolation,' but must be considered in the context of the instruction as a whole and the trial record. Cupp v. Naughten, 414 U.S. [141], at 147, 94 S.Ct. [396], at 400-01 [38 L.Ed.2d 368, at 373 (1973)]." Estelle v. McGuire, 502 U.S. 62, ___, 112 S.Ct. 475, 481, 116 L.Ed.2d 385 (1991). See also Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992).
The instruction on the Fair Campaign Practices Act was given only after the issue was injected into the case by the defense so often as to cause a prudent judge to conclude that it warranted comment. The trial court gave this instruction to direct the jury to the issues involved in the case. The court had a duty to direct the jury to the real issues involved in the case, i.e. that for which Hunt was indicted.
"The charge to the jury should give them such instructions as may be required to enable them to understand the nature of the offense charged, and the questions which they are to decide ... Ordinarily the duty of the trial court is to instruct on the general principles of law applicable to the case...."
23A C.J.S. Criminal Law § 1190(b) (1961).
Although Hunt asserts in brief that this charge was tantamount "to a directed verdict for the state," the brief later states: "[E]ven if the charge were a correct statement of law under the Alabama Fair Campaign Practices Act, Guy Hunt was not charged with a violation of that statute and it was not cited in the indictment." Hunt's brief at p. 53.
Hunt should not be allowed to inject into his trial a defense that the funds raised after the election for the non-profit corporation were "excess campaign funds" and then predicate error on the trial court's advising the jury of the law as it related to that theory of the case. After reviewing the entire instruction to the jury and the record, we are convinced and hold that no error occurred here and that Hunt was not prejudiced *1017 as a result of the above instruction. Traywick, supra.

C.
In regard to the court's jury charge on campaign funds, Hunt further asserts that the legal principle of equitable estoppel warrants reversal in this case. He argues that the trial judge was estopped from giving the instruction concerning the Fair Campaign Practices Act after he had stated in a pretrial hearing that he understood that excess campaign funds could be used for personal use. In response, the state points to a portion of the record which occurred during Melvin Cooper's testimony in which the trial judge observed that upon reading the two statutes together, he could only conclude that excess campaign funds could not be used for direct personal financial gain, because that would be a direct violation of the Ethics law. In fact, the judge in the earlier hearing predicated his remarks by saying that he was not clear on the law as regarded excess campaign funds. We find this equitable estoppel argument to be without merit.

D.
Hunt also argues that the charge at issue could be likened to an ex post facto law. He asserts that he relied on the advisory opinions of the Attorney General which interpret the Fair Campaign Practices Act and state that excess campaign funds could be used as personal income. Hunt argues that these opinions made his conduct lawful. As we have noted, Hunt's criminal conduct occurred considerably before the issuance of the opinions by the Attorney General. Hunt cannot rely on opinions rendered after his conduct in order to invoke any constitutional prohibition against ex post facto laws.

E.
Hunt argues that the trial court erred in denying several of his written requested jury instructions. After the court gave its oral charge to the jury, the defense made the following objection: "We would renew our objection to that part of the oral charge that did charge on the unlawfulness of using excess campaign expenses to be a violation of the law." The only portion of the charge that Hunt objected to was the court's instruction that excess campaign funds could not be used for direct personal gain as such was a violation of the Ethics Law. No issues were preserved concerning other portions of the court's instructions to the jury, including written requested charges. As stated in Rule 21.2, A.R.Cr.P.:
"No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless he objects thereto before the jury retires to consider its verdict, stating the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."
See also Jones v. State, 591 So.2d 569 (Ala. Cr.App.1991); Kyser v. State, 513 So.2d 68 (Ala.Cr.App.1987).
Nevertheless, in an abundance of caution, we will review these issues as if they had been preserved. The requested charge reads as follows:
"If you believe from the evidence that the Defendant used campaign funds to reimburse himself for past or present campaign indebtedness, you must acquit the Defendant."
In the court's oral charge, the trial court instructed the jury that excess campaign funds could lawfully be used to pay old campaign debts. Thus, the written requested charge was substantially given in the court's oral charge to the jury. (R. 1528). No error occurred in the court's refusal of the above requested charge. As Rule 21.1, A.R.Cr.P., states in part:
"The refusal of a requested written instruction, although a correct statement of the law, shall not be cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge or in other charges given at the request of the parties."
"[A] refusal to give a requested written instruction can be error only if the same principles are not substantially covered in the *1018 court's oral charge to the jury." Williams v. Allstate Ins. Co., 591 So.2d 38, 43 (Ala.1991) (emphasis added). See also Powell v. State, 608 So.2d 411 (Ala.Cr.App.1992); Reuther v. City of Leeds, 599 So.2d 1246 (Ala.Cr.App. 1992); Dill v. State, 600 So.2d 343 (Ala.Cr. App.1991), affirmed, 600 So.2d 372 (Ala.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1293, 112 L.Ed.2d 684 (1993). "If a requested charge is subsumed in the court's oral charge, the refusal of the charge is not error." Ex parte Marek, 556 So.2d 375, 383 (Ala.1989).
Hunt also argues that the court erred in refusing the following requested charge:
"The Court charges the Jury, that the Campaign Reporting Act that was in effect until July 1, 1988, was entitled the `Alabama Corrupt Practices Act.' The Corrupt Practices Act did not regulate the use of campaign contributions after an election."
This instruction had no application to the facts or issues of this case. The election was over and Hunt was "elected" before the solicitations for funds for the non-profit corporation were mailed out. Consequently, none of the funds raised in response to Hunt's fund drive can reasonably be called "excess campaign funds." At the time of the actual use of office for direct personal financial gain, which was the subject of this indictment, the Corrupt Practices Act contained in § 17-22-1 et seq. had been repealed and was no longer the law. That act had been replaced by the Fair Campaign Practices Act, § 17-22A-7. The trial court did not err in denying this requested instruction.
We conclude that the trial court did not commit any reversible error in refusing the requested charges.

III. THE STATUTE OF LIMITATIONS
Hunt contends that his prosecution was barred by the three-year statute of limitations applicable to a prosecution under the Alabama Ethics Law and that the trial court committed reversible error by refusing to charge the jury on the statute of limitations.

A.
A prosecution may be commenced by the finding or returning of an indictment. Ala.Code 1975, § 15-3-7; Rule 2.1, A.R.Cr.P. The indictment in the instant case was returned by the Montgomery County grand jury on December 28, 1992. The statute of limitations applicable in this case is three years. Britain v. State, 518 So.2d 198 (Ala. Cr.App.1987), cert. denied, 486 U.S. 1008, 108 S.Ct. 1736, 100 L.Ed.2d 199 (1988). "Violation of the Alabama Ethics Act is a felony, § 36-25-27(a), to which applies the three-year statute of limitations applicable to felonies in general. § 15-3-1." Id. at 201. Thus, the state, as part of its burden of proof, was required to prove that the offense giving rise to the indictment in the instant case was committed on or after December 28, 1989. If such is not shown, the state fails to make out a case, and the prosecution would be barred by the statute of limitations. See Stoner v. State, 418 So.2d 171 (Ala.Cr.App.), cert. denied, 418 So.2d 184 (1982), cert. denied, 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 978 (1983). A statute of limitations defect is considered "jurisdictional" in the sense that the trial court is not authorized to pronounce the accused guilty of a time-barred offense. Cox v. State, 585 So.2d 182, 193 (Ala.Cr.App. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1676, 118 L.Ed.2d 394 (1992).
The indictment charges a violation of § 36-25-5, the use of an official position or office for direct personal financial gain. That statute provides:
"No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law."
The gravamen of the offense is the prohibition of the use of an official position to obtain a direct personal financial gain. "Obtains" is defined in § 13A-8-1(6), as follows: "In relation to property, to bring about a transfer or purported transfer of a legally recognized interest in the property, whether to the obtainer or another." Although § 36-25-1, the definition section of the Act, contains no definition *1019 for "gain" or "personal financial gain." "[I]t is clear from the policy behind this statute, that the term `gain' is not intended to be a precise or comparative term, because it is the appearance of impropriety that this statute seeks to avoid." Chandler v. State, 615 So.2d 100, 106-107 (Ala.Cr.App.1992), cert. denied, 615 So.2d 111 (Ala.1993). However, "by its own language § 36-25-5(a) prohibits only those uses of official positions or offices that result in financial gain that is `direct' and `personal.'" Lambert v. Wilcox County Commission, 623 So.2d 727 (Ala. 1993). See also Opinion of the Justices No. 317, 474 So.2d 700, 703 (Ala.1985) (wherein the court, in construing the phrase "personal or private interest," quoted the "pertinent and persuasive authorit[y]" of an opinion of the Attorney General of Delaware which states that "[i]t has been held by the courts, that for an interest to be `personal or private' it must be a direct and immediate interest").
Hunt contends that the last possible date for the obtaining of a direct personal financial gain by him occurred on November 12, 1988, when the Cullman Savings and Loan Association Friends of Guy Hunt "political" account (# 15385-8) was closed and merged into his personal account (# 15386-6). Upon this assertion, Hunt alleges that the offense, if any, occurred beyond the three-year statute of limitations period and was barred from prosecution.
On the other hand, the state responds that the Cullman Savings and Loan Association "political" account (# 15385-8) was not closed on November 12, 1988, but remained open and in existence on December 29, 1989, a date within the three-year statute of limitations period by one day. The state argues that this date is significant because it was on this date that the last transfer of funds ($11,700) was made from the "political" account to Hunt's personal checking account in the AmSouth Bank and that those funds were used to make a payment on a note and mortgage on Hunt's farm.
A brief review of the pertinent banking transactions is helpful in understanding this issue. The evidence shows that on November 26, 1986, an account was opened in the Union Bank and Trust Company of Montgomery to receive the funds being raised to pay the expenses of the Hunt "inauguration and transition." On January 8, 1987, another account in that same bank, designated "Friends of Guy Hunt," was opened, and approximately $394,573 of the inaugural and transition funds being received from solicitations was diverted into that checking account. On February 12, 1987, $100,000 was transferred by check from the Friends of Guy Hunt account at the Union Bank and Trust Company in Montgomery to a checking account at the First Federal Savings and Loan of Cullman, titled "Friends of Guy Hunt, Guy Hunt Reserve." From February 16, 1987, until August 2, 1988, numerous checks were drawn on this account to pay personal expenses and debts of Hunt and his family. On February 14, 1987, a savings account was opened in the Cullman Savings and Loan Association, titled "Friends of Guy Hunt" (# 15385-8). On that same date $100,000 was transferred into that account by check from the Friends of Guy Hunt account in the Union Bank and Trust Company of Montgomery. From October 16, 1987, until December 29, 1989, the bulk of these funds was withdrawn from this account, usually in the form of a cashier's check, and deposited into Hunt's personal account at AmSouth Bank in Cullman. After the funds were deposited in the personal account, they were periodically drawn from that account to pay the personal debts and expenses of Hunt and his family.
On February 14, 1987, the date that the Friends of Guy Hunt account (# 15385-8) was opened in the Cullman Savings and Loan Association [hereinafter the Association], a personal savings account, titled "Guy Hunt or Mrs. Guy Hunt" (# 15386-6) was opened in the same Association. Guy Hunt, Rosie Blocher, and Edna Earle Hicks were initially the authorized signatories on the Friends of Guy Hunt account. Each was authorized to draw upon the account, and Guy Hunt was the sole authorized signatory on the Guy Hunt or Mrs. Guy Hunt personal account. On November 12, 1988, a single or consolidated signature card was created by the Association, showing "Guy Hunt or Mrs. Guy Hunt" as the name on the two accounts and carrying forward Guy Hunt as the only authorized *1020 signatory on the two accounts. The two account numbers were retained on the signature card. The old signature card for the Friends of Guy Hunt account has written on it "Names Changed 11-12-88." The records of the Association, titled "Savings History Report," show that the Association considered the two accounts to be separate and continuing accounts and that the withdrawal of the sum of $11,700 on December 29, 1989, the transfer of our immediate concern, came from the account which had been titled the Friends of Guy Hunt account, # 15385-8. The Association continued to keep separate ledger sheets on both accounts. After November 12, 1988, when the signature cards were consolidated and Hunt became the sole signatory on account # XXXXX-X, he continued to draw funds from that account, utilizing cashier's checks to transfer funds from that account to his personal checking account at the AmSouth Bank of Cullman. The final withdrawal from the account, which occurred on December 29, 1989, in the amount of $11,700, was in the form of a cashier's check made payable to Guy Hunt or Mrs. Guy Hunt and deposited into Hunt's personal checking account at the AmSouth Bank. Those funds were immediately used to cover a $16,297.23 check drawn on the personal account to make a payment to the Merchant's Bank of Hanceville on a note and mortgage on Hunt's farm.
We find without merit and contrary to the evidence Hunt's contention that, if at all, he received direct personal financial gain on November 12, 1988, because the Friends of Guy Hunt account was closed and simultaneously a personal account was opened. The witnesses' testimony and the records themselves clearly show that the account was not closed or merged on November 12, 1988, as Hunt contends, but that it remained in existence well after December 29, 1989, the date of the withdrawal of $11,700. The record refutes any contention that, by the bank's notations of November 12, there was any transfer of a legally recognized interest in the account to Hunt. No transfer occurred because the interest held by Hunt after November 12 was the same interest he held before November 12. By the clear language and intent of the statute, we find that the elimination of Hicks and Blocher as signatories on the Friends of Guy Hunt account on November 12 did not transfer to Hunt a direct and personal financial gain.
A direct and personal financial gain from the inaugural and transition funds did occur on December 29, 1989, when Hunt withdrew $11,700 from account #XXXXX-X, deposited those funds in his personal checking account, and used the funds to make a payment on the note and mortgage on his farm. We further note that this same transaction violated the Ethics Act because Mrs. Hunt was a cosignee on the note and mortgage and as such, being a member of Hunt's family, she received a direct personal financial gain on that date (as did a business with which Hunt was associated, the farm.) We find that the prosecution met its burden of proof because it presented evidence showing that the offense charged in the indictment occurred on December 29, 1989, before the three-year statute of limitations period had expired.

B.
Hunt contends that the trial court committed reversible error by refusing to give the following requested written instruction number 12 to the jury.
"I charge you that the indictment in this cause was returned on December 28, 1992. I further charge you that the statute of limitations in this case is three (3) years and, therefore, any offense charged in that indictment is barred by the statute of limitations if the alleged offense occurred prior to December 28, 1989.
"I charge you, therefore, that if you find from the evidence that the offense alleged in the indictment occurred prior to December 28, 1989, you must acquit the Defendant."
While there is some question as to whether this point was properly preserved for review, the ultimate issue here is whether the questions of the statute of limitations was a question of law for the trial court to decide or a question of fact for the jury to determine. If the above requested charge had been given, it would have submitted the question to the jury. Hunt asserts that whether the state *1021 had met its burden of proving that the offense occurred within three years preceding the indictment was a factual issue which should have been submitted to and decided by the jury.
Hunt, by a pre-trial motion, sought dismissal of all the charges on the ground that the statute of limitations had expired. After a hearing, the trial court granted the motion as to Counts II through XIII, but denied the motion as to Count I. Counts II through XIII were theft-related counts, and Count I alleged a violation of the State Ethics Law. The trial court's ruling is as follows:
"And that brings me to the motion to dismiss the indictments relating to the statute of limitations. We're dealing with two statutes here, one requiring knowingly obtaining or exerting unauthorized control over property, and the other requiring that certainprohibiting certain people from obtaining direct personal financial gain for himself. This Court is of the opinion that the statutes are different, they have different elements involved and because of the different elements involved that there are going to be different rulings, and you'll see that in just a minute.
"As to Count I in the indictments for each of the Defendants, Count I concerning the Ethics related charge in which the question concerning whether or not it's state revenue or not state revenue, whether or not there would be a six year statute versus a three does not apply here. However, the Court is of the opinion because of the elements of the Ethics charge that your motion to dismiss due to statute of limitations is due to be denied.
"As to Counts II through XIII relating to theft, theft by deception, receiving stolen property, all alleged in different forms from different possible sources such as Inaugural Fund, Inc., Alabama Inaugural Fund or the State of Alabama, the question must be decided as to which statute applies, whether or not the six year statute of limitations applies as relating to state revenue or county revenue or the three year general theft statutes apply, which is a three year statute. The Court is of the opinion that in interpreting the statute, that the state revenue six year statute does not apply to this fact situation and therefore we are looking to see whether or not the alleged offenses occurred within three years. It is this Court's opinion that the motion to dismiss on Counts II through XIII to each Defendant should be granted and I hereby grant your motion and all of those theft and theft related counts are hereby dismissed from the indictment; and what we have left at this point in time is the allegation of an Ethics violation. It's the Court's opinion that due to the elements of the offense of theft that any control or gain, based on the Defense's proof of a 1988 change of the account was done, takes it outside the statute of limitations and I hereby grant your motion to dismiss on that."
Hunt did not raise the issue of whether the statute of limitations question was one of fact or of law prior to the charge conference when requested jury instruction 12 was considered by the trial court. In refusing to give the requested charge, the trial court stated, "I think this matter is a question of law...." R-1260.
The general rule is that where a disputed question of fact is involved, it is for the jury to say whether a prosecution was begun within the period of limitations, but all questions of law as to limitations are for the court. Gambling v. State, 22 Ala.App. 442, 116 So. 507 (1928); Horn v. State, 19 Ala. App. 572, 99 So. 58 (1924); Cook v. State, 17 Ala.App. 611, 88 So. 58 (1920); Commonwealth v. Groff, 378 Pa.Super. 353, 548 A.2d 1237 (1988); Commonwealth v. Hoffman, 263 Pa.Super. 442, 398 A.2d 658 (1979); 23A C.J.S. Criminal Law § 1132 (1961).
In ruling as it did, the trial court obviously found as a matter of law that Count I required proof that Hunt or his family or a business with which he was associated obtained a direct personal financial gain before the crime was complete as distinguished from obtaining or exerting unauthorized control over property which would be required proof in Counts II through XIII, the theft counts. The trial court recognized that it was dealing with two separate statutes with different elements. In deciding the statute *1022 of limitations issue, the trial court obviously found as a matter of law that Hunt or his family or a business with which he was associated last received direct personal financial gain on December 29, 1989, as contended by the state.
We conclude, after reviewing the evidence, that the facts pertinent to the question of whether the indictment was returned within the period of the statute of limitations were not in dispute; the facts relating to the handling of the various accounts and the withdrawal and use of the funds by Hunt were unrefuted and, in fact, were admitted. The question of whether the statutory period had expired was a question of law for the court and one which the trial court determined prior to trial. We agree with the trial court's decision. Its refusal to grant requested jury instruction 12 was correct.

IV. THE INDICTMENT

A.
Hunt maintains that the trial court committed reversible error in failing to sustain his motion to dismiss the indictment. This issue is preserved for our review. In a supplement to his pretrial motion to dismiss, Hunt alleged that the indictment was "insufficient to charge a criminal offense in that it fails to allege that Hunt knowingly or willfully violated § 36-25-5, Ala.Code (1975), as required by § 36-25-27, Ala.Code (1975)." C.R. 485-486. In addition, Hunt filed a motion for more definite statement pursuant to Rule 13.2(e), A.R.Cr.P. in which this issue was presented. C.R. 477, 481. In response to this motion, the Attorney General filed a lengthy written response with extensive exhibits. C.R. 543-586.
Appellate courts review the legal sufficiency of indictments de novo. United States v. Schmidt, 947 F.2d 362, 369 (9th Cir.1991).
"The Federal Rules of Criminal Procedure require that an indictment be a `plain, concise, and definite written statement of the essential facts constituting the offense charged.' An indictment need only contain those facts and elements of the alleged offense necessary to inform the accused of the charge so that she may prepare a defense and invoke the Double Jeopardy Clause when appropriate. Courts will normally find an indictment insufficient only if it fails to state a material element of the offense.
"In determining whether an indictment sufficiently informs the defendant of the offense, courts give the indictment a common sense construction and generally will uphold an indictment even if it contains a technical error or omission. Validity of the indictment turns on whether it conforms to minimum constitutional standards, not whether the indictment could be framed more satisfactorily. Although an indictment that tracks the statutory language defining an offense is usually sufficient, reliance on statutory language alone will not cure a fatal defect in an indictment.
".... The availability of a bill of particulars will not cure an indictment that omits an essential element of the offense."
Daniel F. McInnis et al., Project, Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo.L.J. 853, 1076-1081 (1993) (footnotes omitted).
The indictment charged in pertinent part that Hunt
"while a public official or employee, to wit: the Governor of the State of Alabama, did use an official position or office, to wit: the Office of the Governor of the State of Alabama, to obtain direct personal financial gain, to wit: two hundred thousand dollars ($200,000) in lawful currency and/or coinage of the United States of America and/or checks, a better description of which is unknown to the Grand Jury, for himself or his family or any business with which he or a member of his family is associated, said use and gain not being specifically authorized by law in violation of Section 36-25-5 of the Code of Alabama, against the peace and dignity of the State of Alabama." C.R. 26.
The statute under which Hunt was indicted, Ala.Code 1975, § 36-25-5(a), provides:

*1023 "No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law."
Here, the indictment parroted the language of § 36-25-5(a). However, the penalty for this conduct is prescribed by § 36-25-27(a)(1) which requires that the conduct be "knowingly or willfully" committed. Section 36-25-27(a)(1) provides:
"Any person subject to this chapter who knowingly or willfully violates any provisions of this chapter other than the requirements of financial and lobbying disclosure shall be found guilty of a felony and shall be fined not more than $10,000.00 or less than $2,001.00, or shall be imprisoned for not more than 10 years but not less than two years or any combination thereof." (Emphasis added).
It is undisputed, both at trial and on appeal, that "knowingly or willfully" is an element of the offense defined in § 36-25-5(a).
"The appellant argues that the indictment charging him with six counts of violating the State Ethics Law are void, because the indictment used the words `unlawfully' and `feloniously' to allege mens rea rather than `knowingly.' The appellant cites the punishment section of this act, § 36-25-27, Code of Alabama 1975, which uses the terms `knowingly' and `wilfully' to define the requisite mens rea necessary to commit the offense, and he argues that those terms were therefore required in framing the indictment. His argument is based on Davis v. State, 68 Ala. 58 (1880), which involved an indictment charging a violation of a statute defining as unlawful the transportation of cotton after dark. A subsequent section of that statute made it a crime to `knowingly' violate any other section of that statute. The Court held that this element of knowledge must be included and charged in the indictment.
"`Sometimes statutes make it a criminal offense for a public officer to be directly or indirectly concerned in any agreement or contract for any improvement to be made at the public expense, or any other contract made by the officer in his official capacity. Even in the absence of an express statement that criminal intent is a necessary element of the statutory offense, the statutes, in the absence of a clear indication to the contrary, are construed as requiring that the officer's concern in the contract be corrupt.'
"63A Am.Jur.2d Public Officers and Employees § 411.
"Thus, it is clear that in the State Ethics Law such a mens rea is impliedly included and, in the present case, was proved. According to § 13A-2-4(b), Code of Alabama 1975:
"`Although no culpable mental state is expressly designated in a statute defining an offense, an appropriate culpable mental state may nevertheless be required for the commission of that offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, states a crime of mental culpability.'
"Clearly, this offense is not one involving strict liability."
Chandler v. State, 615 So.2d 100, 107-08 (Ala.Cr.App.1992), cert. denied, 615 So.2d 111 (Ala.1993).
An issue similar to the situation here was presented in Davis v. State, 68 Ala. 58 (1880), the Alabama Supreme Court found the indictment defective for failing to charge that the offense was committed knowingly. In that case, "[t]he indictment charged that the defendant `did, after sundown, and before sunrise of the succeeding day, transport or remove in Dallas county, cotton in the seed.'" Davis, 68 Ala. at 59. Section two of the legislative act in question provided "that it shall not be lawful for any person to transport or move, after sunset and before sunrise of the succeeding day, ... [within specified localities] any cotton in the seed." Davis, 68 Ala. at 61. Section five of that act made "it a *1024 felony where any one `knowingly violates' any of the provisions of the act, and affix[ed] punishment by confinement in the penitentiary." Davis, 68 Ala. at 61.
"We are of opinion, however, that the indictment is defective in another respect. It fails to charge that the defendant `knowingly' committed the act for which he is criminally indicted. The statute is highly penal in its character, and creates a new crime unknown to the common law. Section 5 makes knowledge of the facts essential to the crime, deeming him alone guilty who knowingly violates any of the provisions' of the act. The general rule of pleading is, that every indictment, information or other criminal proceeding, ought to contain all that is material to constitute the crime, or every necessary ingredient of the offense, stated with precision, or at least certainty and in the customary forms of law.3 Greenl.Ev. § 10; Beasley v. State, 18 Ala. 535. A crime is committed only by a combination of act and intent. `No amount of intent alone is sufficient, neither is any amount of act alone; the two must combine.'1 Bish.Cr.Law, § 430 (6th ed.). In the particular crime here charged, there are forcible reasons for the application of this rule requiring the indictment to state the guilty scienter. The transportation of the prohibited commodity may have been done ignorantly. The defendant may honestly have believed that he was without the prohibited jurisdiction.
"For this defect, the judgment of the Circuit Court must be reversed and the case remanded."
Davis, 68 Ala. at 65.
In Associated Industries of Alabama, Inc. v. State, 55 Ala.App. 277, 283, 314 So.2d 879, cert. denied, 294 Ala. 281, 314 So.2d 901 (1975), the defendant was indicted for violating the Alabama Corrupt Practices Act. Under that act, any person who "wilfully" failed or refused to any act required under the act was guilty of a misdemeanor[3]. This Court held, among other things, that the indictment was void because it did not allege any criminal intent:
"He whose conduct is defined as criminal is one who `willfully' fails to do any of the acts denounced by the Corrupt Practices Law, and willfulness is an essential and constituent element of the charge in an indictment brought under said law. The indictment failing to so charge renders it fatally defective upon apt demurrer taking the point, as was done in this case."
Associated Industries, 55 Ala.App. at 283, 314 So.2d 879. However, in denying certiorari, the Alabama Supreme Court did not respond to any particular issue addressed by the Court of Criminal Appeals but merely issued a general "disclaimer":
"Writ denied. By denying the writ, we point out that writs of certiorari are frequently denied without any consideration of the merits. A denial of certiorari should never be considered as an expression by the reviewing court on the merits of the controversy nor should our denial of the writ be understood as approving or disapproving the language used, or the statements of law contained in the opinion of the Court of Criminal Appeals."
Associated Industries of Alabama, Inc. v. State, 294 Ala. 281, 281, 314 So.2d 901 (1975).
Application of Davis and Associated Industries to the facts of this case would require a reversal. However, the decision of the Alabama Supreme Court in Ex parte Harper, 594 So.2d 1181 (Ala.1991), cert. denied, ___ U.S. ___, 113 S.Ct. 330, 121 L.Ed.2d 248 (1992), requires that we reject the holdings of Davis and Associated Industries.
In Harper, the Alabama Supreme Court held that an indictment alleging that the defendant "unlawfully" distributed a controlled substance was not void for failing to *1025 allege that the distribution was "knowingly" done. The Court recognized that knowledge was an element of the offense which should have been alleged in the indictment, but it held that the defendant had failed to raise a timely objection to that omission from the charge. The Court decided that "[e]ven if [the defendant] had a valid objection to the statement of the charge, and we find that he did not have a valid objection in this case, he failed to raise an objection timely." Harper, 594 So.2d at 1194 (emphasis added).
The court apparently had two reasons for determining that the defendant "did not have a valid objection" to the Harper indictment, despite the omission of the knowledge allegation. First, the court found it "important," 594 So.2d at 1182, that "the procedure for preferring an indictment was governed by the provisions of Temporary Rule 15.2 [now Rule 13.2, A.R.Cr.P.]." Under that rule, "[t]he indictment or information shall be a plain, concise statement of the facts in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce proper judgment."
"The general rule in Alabama, even before the adoption of Temporary Rule 15 (now Rule 13), was that it was sufficient to charge the elements of the statutory offense in the words of the statute, provided the statute prescribed with definiteness the constituent elements of the offense. Ex parte Allred, 393 So.2d 1030 (Ala.1980); see, also, cases collected at 12 Ala.Dig., Indictment and Information, Key No. 110(3). The crucial question, of course, is whether the indictment sufficiently apprises the accused with reasonable certainty of the nature of the accusation made against him so that he may prepare his defense, that he may be protected against a subsequent prosecution for the same offense. See Hochman v. State, 265 Ala. 1, 91 So.2d 500 (1956), in which the Court distinguished Gayden v. State, 262 Ala. 468, 80 So.2d 501 (1955), a leading case on the sufficiency of an indictment, in which a divided Court held that two counts of an indictment against Gayden were defective and subject to a demurrer."
Harper, 594 So.2d at 1183. The Court further noted that it "has liberalized criminal pleading and has provided a method for defendants to obtain a more definite statement of the charges [pursuant to Rule 13.2, A.R.Cr.P.]." Harper, 594 So.2d at 1183.
Second, the court found that Temporary Rule 15.5(c)(2) [now Rule 13.5(c)(2)] provides for a "harmless error" review of a defective charging instrument.
"The Court of Criminal Appeals correctly held, in Stewart [v. State, 580 So.2d 27 (Ala.Cr.App.1990)], that if a statute requires that the offense be `knowingly' committed, then the indictment should allege that it was so committed, and if an objection to the indictment is raised by the trial court or the defendant `during the pendency of the proceeding,' the indictment is defective and would be subject to dismissal, unless otherwise provided for in Temporary Rule 15.5(c)(2) (now Rule 13.5(c)(2)), which states, in part, that `[n]o charge shall be deemed invalid, nor shall the trial, judgment, or other proceedings thereon be stayed, arrested, or in any manner affected, for any defect or imperfection in the charge which does not tend to prejudice the substantial rights of the defendant upon the merits.'
".... Even if he had a valid objection to the statement of the charge, and we find that he did not have a valid objection in this case, he failed to raise an objection timely.
"Based on the foregoing, we are clear to the conclusion that the defendant's constitutional right `to demand the nature and cause of the accusation' (Art. 1, § 6, Const. of Ala.1901) has been fulfilled in this case. The indictment is not void for failing to allege that the offense was committed `knowingly.'
"This opinion should not be construed, however, as stating that the State may not be required to prove that the defendant knew of the presence of a controlled substance,.... [K]nowledge must be proved in order to establish that an offense was committed.....

*1026 "Based on the above, we hold that the indictment was not void for its failure to allege that the distribution of the controlled substance was `knowingly' done. We further hold that the petitioner's objection was untimely, because it was not made `during the pendency of the proceeding.'" (Emphasis added).
Harper, 594 So.2d at 1194-95.
From the above discussion we draw the following conclusions: 1) Knowledge or willfulness is an element of the offense defined in Ala.Code 1975, § 36-25-5. 2) Under Davis, supra, knowledge or willfulness should have been alleged in the indictment. 3) After the adoption of Rule 13, A.R.Cr.P. and the opinion of the Alabama Supreme Court in Harper, the failure to allege criminal intent in an indictment does not necessarily render an indictment void and in some cases does not even render it objectionable even in those cases where criminal knowledge is necessary for the proof of the crime charged.
Frankly, Harper raises many more questions than it answers. However, this Court is bound by the decisions of the Alabama Supreme Court. Ala.Code 1975, § 12-3-16.
We conclude that Ex parte Harper, rather than Davis or Associated Industries, controls the result in this case. Hunt was given a more definite statement of the charges against him, and the State presented evidence from which the factfinder could infer that Hunt committed the offense knowingly and wilfully. Therefore, any imperfection in the indictment did not "tend to prejudice [Hunt's] substantial rights upon the merits." Rule 13.5(c)(2), A.R.Cr.P.

B.
Hunt argues that the statute and the indictment under which he was charged are so vague and indefinite as to deprive him of his rights as guaranteed by Article One, Section six of the Constitution of Alabama, 1901, and under the Sixth Amendment to the Constitution of the United States. This argument was preserved in Hunt's pretrial motion to dismiss and in his motion for a more definite statement.
"The indictment or information shall be a plain, concise statement of the charge in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment."
Rule 13.2, A.R.Cr.P.
As demonstrated in Part IV A of this opinion, the indictment was constitutionally sufficient and closely tracked the language of Ala.Code 1975, § 36-25-5(a). "The government need only allege the `essential facts necessary to apprise a defendant of the crime charged' and not its theory of the case." United States v. Schmidt, 947 F.2d 362, 369 (9th Cir.1991).
While the sufficiency of a criminal indictment is determined from its "face" and within "the four corners" of the indictment, any "vagueness" or "uncertainty" in Hunt's understanding of the indictment was removed by the Attorney General's lengthy response to Hunt's motion for a more definite statement.
As part of this argument, Hunt argues that "[t]he failure of the legislature to define the words `use' and `to obtain direct personal financial gain' leave one in a quandary if the law is that the indictment and the language of the statute are sufficient." Hunt's brief at 71.
In Allen v. State, 380 So.2d 313, 326 (Ala. Cr.App.1979), cert. denied, 380 So.2d 341 (Ala.), cert. denied, 449 U.S. 842, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980), this Court stated: "The Alabama Supreme Court in Comer v. City of Mobile, Ala., 337 So.2d 742 (Ala.1976), considered the constitutionality of Act No. 130 of the Alabama Legislature, Regular Session 1975, and found the Act `not vague or overbroad.'" However, Comer was not concerned with the arguments here presented.
"`The doctrine of vagueness, ... originates in the due process clause of the Fourteenth Amendment, see Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), and is the basis for striking down legislation which contains insufficient warning of what conduct is unlawful, *1027 see United States v. National Dairy Products Corporation, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).
"`Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989, 996 (1954). A vague statute does not give adequate "notice of the required conduct to one who would avoid its penalties," Boyce Motor Lines v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367, 371 (1951), is not "sufficiently focused to forewarn of both its reach and coverage," United States v. National Dairy Products Corporation, 372 U.S. [29] at 33, 83 S.Ct. [594] at 598, 9 L.Ed.2d [561] at 566 [(1963)], and "may trap the innocent by not providing fair warning," Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222, 227-28 (1972).
"`As the United States Supreme Court observed in Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948):
"`"There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment. The vagueness may be from uncertainty in regard to persons within the scope of the act, or in regard to the applicable tests to ascertain guilt."'"
"`333 U.S. at 515-16, 68 S.Ct. at 670, 92 L.Ed. [at] 849-50 [citations omitted].'

"McCrary v. State, 429 So.2d 1121, 1123-24 (Ala.Cr.App.1982), cert. denied, 464 U.S. 913, 104 S.Ct. 273, 78 L.Ed.2d 254 (1983)."
McCall v. State, 565 So.2d 1163, 1165 (Ala.Cr. App.1990).
"It is well settled that, in order to pass constitutional muster, a penal statute must `define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted).
"`Due process requires that all "be informed as to what the State commands or forbids," Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939), and that "men of common intelligence" not be forced to guess at the meaning of the criminal law. Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).'

"Smith v. Goguen, 415 U.S. 566, 574, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974)."
Senf v. State, 622 So.2d 435 (Ala.Cr.App. 1993).
Here, § 36-25-5(a), the statute under which Hunt was indicted and convicted, provides fair warning of what is forbidden. See Rose v. Locke, 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). Clearly, this section informs ordinary people of the prohibited conduct. See Wright v. State, 599 So.2d 637, 638 (Ala.Cr.App.), cert. denied, 609 So.2d 452 (Ala.1992).
Furthermore, Hunt has no legitimate ground to complain that this statute is unclear as to his conduct. "Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand." Jordan v. State, 411 So.2d 816, 818 (Ala.Cr.App. 1981).
"[B]ecause `[t]he essential purpose of the "void for vagueness" doctrine is to warn individuals of the criminal consequences of their conduct,' Jordan v. De George, 341 U.S. 223, 230, 71 S.Ct. 703, 707, 95 L.Ed. 886 (1951), `[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness,' Parker v. Levy, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974), `even though the statute may well be vague as applied to others,' Aiello v. City of Wilmington, 623 F.2d 845, 850 (3d Cir.1980). Therefore, a defendant who challenges a statute on the grounds of vagueness `must demonstrate that the statute under attack is vague as applied to his own conduct, regardless of the potentially vague applications to others.' Aiello, 623 F.2d at 850 (emphasis *1028 added). Accord Rode v. Dellarciprete, 845 F.2d 1195, 1199-1200 (3d Cir.1988)."
Senf, 622 So.2d at 437 (footnote omitted). Hunt has failed to meet that burden.
Regarding the definitions of words found in the Ethics Act: The word "obtains" is defined in Ala.Code 1975, § 13A-8-1(6)[4]. That definition was given the jury in the oral charge of the trial court.
"Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says." IMED Corp. v. Systems Engineering Associates Corp., 602 So.2d 344, 346 (Ala.1992). "There is another generally accepted canon of statutory construction, which is that where there is nothing to indicate to the contrary, words in a statute will be given the meaning which is generally accepted in popular, everyday usage." Holloway v. State, 262 Ala. 437, 440, 79 So.2d 40 (1955).
We reject Hunt's arguments that, "[a]s written, the statute could be taken to untold limits," and the "Ethics Act vests almost absolute discretion in the Attorney General to decide what constitutes using one's office for direct personal financial gain." Hunt's brief at 73 and 74. "That a statute might be susceptible of misapplication does not necessarily result in its unconstitutionality." Comer, 337 So.2d at 750. The hypothetical situations posed by Hunt are unreasonable and far-fetched and are rejected for that reason. See Lambert v. Wilcox County Commission, 623 So.2d 727 (Ala.1993) ("the phrase `direct personal financial gain' in § 36-25-5(a) can only mean, as regards the facts of this case, `an interest affecting the legislator individually or as a member of a small group.'"). See also Opinion of the Justices No. 317, 474 So.2d 700, 704 (Ala.1985) (construing the phrase "personal or private interest").
"Where, as here, this Court is called upon to construe a statute, the fundamental rule is that the court has a duty to ascertain and effectuate legislative intent expressed in the statute, which may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained."
Ex parte Holladay, 466 So.2d 956, 960 (Ala. 1985).
Any interpretation of "direct personal financial gain" must strike
"the balance intended by the legislature between the policy of eliminating conflicts of interest and the policy of recruiting and retaining those persons best qualified to serve in government. In § 36-25-2(b), the legislature states that while the purpose of the Ethics Law is to eliminate conflicts between the private interests of public officials or employees and their public duties as such, the `legal safeguards against conflicts of interest must be so designed as not unnecessarily or unreasonably to impede the recruitment and retention by the government of those men and women who are best qualified to serve it.'"
Lambert, 623 So.2d at 730 ("Any broader view of `direct personal financial gain' would seriously impair not only the ability of county commissions to attract and retain qualified officials, but also their ability to deal with fiscal problems generally."). "We are deeply mindful of the principle that criminal statutes are to be strictly construed, but adherence to strict construction does not require an unreasonable interpretation, an interpretation that the legislature could not have intended." Horsley v. State, 374 So.2d 363, 372 (Ala.Cr. App.1978), affirmed, 374 So.2d 375 (Ala.1979), vacated on other grounds, Horsley v. Alabama, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980). See Ala.Code 1975, § 13A-1-6 (criminal statutes "shall be construed according to the fair import of their terms to promote justice and to effect the objects of the law....").
*1029 We agree with Hunt that "[t]he focus of the Ethics Act was not on the receipt of or the use of campaign contributions." Hunt's brief at 73. However, Hunt's conduct fell well within the prohibitions of the Ethics Act.
"Appellant maintains that the legislature, in passing the Ethics Act, did not intend that acts such as appellant committed be governed by the Act. Appellant emphasizes portions of the Act that state its purpose is to prevent conflicts of interests between a public official's duties of office and his private interests. See § 36-25-2, Code of Alabama, 1975. Appellant argues that there was no conflict of interests and that the Act was not intended to apply to the facts presented in this case.
"We do not agree.
"Appellant correctly states that the Ethics Act itself, in § 36-25-2, enunciates the legislative intent behind the statute. It is also true that the words `conflicts of interest' are found in this section. However, from a reading of the introductory sentence and the section as a whole, it is clear that the legislature intended the Act to prohibit the actions and conduct of appellant as shown by the facts in this case.
"The broad introductory sentence of the legislative intent section reads: `It is essential to the proper operation of democratic government that public officials be independent and impartial; that government decisions and policy be made in the proper channels of the government structure; that public office not be used for private gain other than remuneration provided by law; and that there be public confidence in the integrity of government.' (Emphasis added [in Rampey]).
"The tenor of the section read as a whole is that the legislature passed the act to prevent public officials from using their offices to reap private gains. The `conflicts of interests' referred to in the section are conflicts between an official's private interests and his official duties. Muncaster v. Alabama State Ethics Commission, Ala., 372 So.2d 853, 855 (1979); Stephens, William T., Alabama Ethics Cases, 10 Cumberland Law Review 317, 319."
Rampey v. State, 415 So.2d 1184, 1186 (Ala. Cr.App.1982).

C.
Hunt argues that the trial court committed error in denying his motion to dismiss the indictment on the grounds of "vindictive, demagogic and political prosecution." Hunt's brief at 74.
Specifically, Hunt argues that he presented evidence of this "vindictive, demagogic and political prosecution" and conduct by the Attorney General. Hunt alleges:
"[There was] evidence of disputes between the Attorney General and the Governor concerning appointment of special assistant attorneys general; dispute over who is in control of state litigation; disputes over the appropriation of $5 million of court settlements to the Attorney General's budget; and the dispute over the subject of legislative call for special sessions through Attorney General opinions.
"[T]he Attorney General went on a media campaign to publicly chastise, condemn and ridicule the Governor; introduced personal tax returns and other documents through the news media; and encouraged a grand jury member to speak out openly against Hunt....
"The Attorney General subpoenaed a member of Hunt's defense team, John Grenier to the Grand Jury. The Attorney General also required that some sixteen boxes of John Grenier's confidential records be produced....
"Without justifiable excuse, the Attorney General filed 1,300 pages of documents in open court. These documents included Governor Hunt's federal tax returns, ethics forms, and bank records." Hunt's brief at 74-5.
Hunt further alleges that he was "singled out" for prosecution because of "his consistent opposition to the Attorney General's efforts to build a political empire at the expense of the people of Alabama." Hunt's brief at 76-7. Finally, Hunt alleges that the Attorney General violated the Rules of Professional Conduct when "he openly generated prejudicial [pre-trial] publicity against Guy Hunt in the media." Hunt's brief at 77.
*1030 Throughout the prosecution and appeal of this case, both the prosecution and the defense have continued to allege that each is attempting to manipulate the news media to further its own position, to create a carnival atmosphere, and of "leaking" and supplying the media with information designed to either prejudice the other party or to obtain an advantage. Hunt's "affidavit in support of motion to dismiss indictment" (Vol. 3 at 517) if anything constituted a personal attack on the attorney general and an exaggerated account of Hunt's own alleged virtues. In fact, that affidavit begins with the statement: "As Governor of Alabama, I have consistently opposed the Attorney General's efforts to build a political empire at the expense of the Alabama taxpayer." Vol. 3 at 517. To one degree or another, both the prosecution and the defense are guilty of the violations with which each has charged the other although neither is guilty to the extent that has been alleged.
The question in this case is not whether the actions of the attorney general have prejudiced Hunt, but whether those actions have unfairly or unlawfully prejudiced Hunt. We find that they have not.
"Courts defer to a prosecutor's broad discretion to initiate and conduct criminal prosecutions, in part out of regard for the separation of powers doctrine and in part because courts recognize that the decision to prosecute is particularly ill-suited to judicial review. Courts presume, in the absence of contrary evidence, that criminal prosecutions are undertaken in good faith and in a nondiscriminatory manner. As long as a prosecutor has probable cause to believe that the accused has committed an offense, the decision to prosecute rests in her discretion. A prosecutor also has broad authority to decide whether to investigate,... determine what charges to bring, when to bring charges, whether to bring charges, and where to bring charges....
"There are limits, however, to a prosecutor's discretion, and the judiciary has a responsibility to protect individuals from prosecutorial conduct that violates constitutional rights. Such conduct generally involves either selective prosecution, which denies equal prosecution of the laws, or vindictive prosecution, which violates due process.

"Selective Prosecution. A prosecutor's decision to bring charges rarely violates the Equal Protection Clause. In Wayte v. United States, [470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (no constitutional violation when government prosecuted only 13 of an estimated 674,000 non-registrants for the military draft)] the Supreme Court held that to demonstrate selective prosecution a defendant must show both that she was treated disparately and that her prosecution was improperly motivated. Discriminatory treatment arises if others similarly situated have not been prosecuted, whereas improper purpose entails selection that was `deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' Because courts presume that the government undertakes a prosecution in good faith, a defendant challenging an indictment on selective prosecution grounds generally bears a heavy burden of proving facts sufficient to satisfy these two requirements.
". . . .

"Vindictive Prosecution. A prosecutor's use of the charging process may violate due process if it penalizes the exercise of constitutional or statutory rights. In Blackledge v. Perry, [417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), the Supreme Court held that the Due Process Clause prohibits a prosecutor from bringing a more serious charge against a defendant who has pursued a statutory right of appeal from a conviction on a lesser charge for the same offense."
Daniel F. McInnis et al., Project, Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo.L.J. 853, 1029-1035 (1993) (footnotes omitted). See United States v. McCord, 695 F.2d 823, 826 (5th Cir.) (per curiam), cert. denied, 460 U.S. 1073, 103 S.Ct. 1533, 75 L.Ed.2d 953 (1983) (wherein the court found no constitutional violation notwithstanding the fact that *1031 accused was the first person in over 26 years to be prosecuted in that district for unlawful flight to avoid confinement, in violation of 18 U.S.C. § 1073).
Here, Hunt has failed to prove that he is being prosecuted for exercising a constitutional or statutory right. Here, the fact is that Hunt was referred to the Attorney General for prosecution by the Alabama Ethics Commission after that Commission had found probable cause to believe that Hunt had violated the terms of the Ethics Act.
We note that under Rule 3.6(a), Rules of Professional Conduct, no information disseminated by the state had a "substantial likelihood of materially prejudicing an adjudicative proceeding." We find no evidence that such prejudicial information has been disseminated by the Attorney General.
Hunt filed a motion for a more definite statement in which the following allegations and grounds were stated:
"1. Count I of the Indictment alleges that Defendant Hunt misused his office for direct personal financial gain in violation of § 36-25-5, Alabama Code, 1975. This count fails to allege that Governor Hunt `knowingly and wilfully' violated this provision, an essential element of the charged offense under § 36-25-27, Alabama Code, 1975. For these reasons, this count does not sufficiently notify Defendant Hunt of what he must defend against because it fails to allege the necessary elements of the criminal statutes involved and does not allege how the Governor used the `Office of Governor' to obtain direct personal financial gain. Accordingly, Defendant Hunt moves for a more definite statement as to (a) how he used the `Officer of Governor' and (b) what `direct personal financial gain' (c) inured to the benefit of (d) himself or (e) his family or (f) any business with which he was associated.
". . . .
"3. Counts III, VI and IX allege that Defendant Hunt knowingly obtained by deception property belonging either to the Hunt Transition and Inaugural Fund, Inc. (Count III), to the State of Alabama (Count IV), or to the 1987 Inaugural Committee (Count IX), with the intent to deprive the owner of said property....
"3(a). Defendant Hunt must know (a) what `deception' he allegedly used to obtain property belonging to another; (b) who the owner of the property was at the time of the alleged deception; and, (c) what property it was he allegedly took by deception. This property had to have been in some identifiable form at the time of such deception. Defendant Hunt must have the requested information to defend against an allegation that he obtained another's property by deception and intended to deprive that owner of such property.
". . . .
"WHEREFORE, PREMISES CONSIDERED, Defendant Hunt respectfully submits that, not only Rule 13.2(e) of the Alabama Rules of Criminal Procedure mandates a more definite statement of the matters asserted in the indictment; but, also failure to more definitely state the matters alleged in the Indictment violates his right to due process of law; and, the Attorney General has violated his professional responsibility as `a minister of justice.' Therefore, the motion for a more definite statement of the Indictment is due to be GRANTED IN ALL RESPECTS." R.Vol. 3 at 477-481.
In response to Hunt's motion for a more definite statement, the Attorney General filed a lengthy written response and attached extensive exhibits including Hunt's income tax returns. At the time of that filing, all 13 counts of the indictment against Hunt were still pending: Count 1 charged a violation of the Ethics Act; Counts 2, 3, and 9 charged theft of property; Counts 4, 7, and 10 charged receiving stolen property; and Counts 11, 12, and 13 charged conspiracy to commit theft of property. The income tax returns were part of the State's proof of the deception allegedly employed by Hunt in committing the theft and were in response to paragraph 3(a) of Hunt's motion specifically requesting a more definite statement concerning the deception.
These tax returns were obtained from Hunt's accountant (Vol. 31 at 950-957) in response to the subpoena of the grand jury.

*1032 "The Supreme Court has stated in dictum that tax records and related documents `in the hands of the taxpayer' are not absolutely privileged. St. Regis Paper Co. v. United States, 368 U.S. 208 [82 S.Ct. 289, 7 L.Ed.2d 240] (1961). In ruling on discovery motions, however, the lower federal courts, `due to the sensitive information contained therein and the public interest to encourage the filing by taxpayers of complete and accurate returns,' have fashioned a qualified privilege imposing high standards of relevancy before parties will be ordered to reveal such records. Mitsui & Co. v. Puerto Rico Water Resources Authority, 79 F.R.D. 72, 80 (1978). Eastern Auto Distributors, Inc. v. Peugeot Motors of America, Inc., 96 F.R.D. 147 (E.D.Va.1982). See also `Discovery of Federal Income Tax Returns' and the New `Qualified Privileges,' 5 Duke L.J. 938 (1984).
"Furthermore, in Tele-Radio Systems LTD. v. De Forest Electronics, Inc., 92 F.R.D. 371, 375 (D.N.J.1981), the court held:
`Unless "clearly required in the interests of justice, litigants ought not to be required to submit such returns as the price for bringing or defending a lawsuit." Where, as here, the information sought is otherwise available, and defendants have not made their income an issue in the case, the income tax returns are not properly discoverable.'"
Ex parte Morris, 530 So.2d 785, 788 (Ala. 1988) (emphasis added). See also Constantine v. Constantine, 274 Ala. 374, 379, 149 So.2d 262 (1963) ("neither federal nor state statute makes copies of the [income tax] returns privileged").
"Income tax records. Neither federal nor state income tax returns are privileged. Such returns, however, are confidential. Therefore, government agencies usually are barred from disclosing the contents of such returns. Although the returns cannot be obtained by third parties from the governmental agencies, they are subject to discovery directly from the parties to litigation. Moreover, they may be admissible in appropriate circumstances. In some instances, though, a qualified privilege may protect even a party's income tax records."
J.A. Colquitt, Alabama Law of Evidence § 5.1 at 159-160 (1990) (footnotes omitted).
"Both a federal statute and an Alabama statute [Ala.Code 1975, § 40-18-52] prohibit the disclosure by public officials or public employees of the contents of income tax returns except under specified conditions. The prohibition, however, does not create a privilege in the taxpayer not to disclose by his own testimony or documents the contents of such returns. In fact, a party has a general right to have his opponent procure and attach to his answers to interrogatories a copy of a relevant income tax return."
C. Gamble, McElroy's Alabama Evidence § 409.03 at 941 (4th ed. 1991).
Here Hunt's tax returns were highly relevant to the charges of theft by deception and Hunt's income was in fact a basic issue in the entire case. We note that Hunt injected his income tax returns into the trial during defense counsel's cross-examination of witness Frye.
"In determining whether the accused was prejudiced by prosecutorial misconduct, `we must ordinarily give great deference to the... judge's handling of the alleged misconduct during the trial. The ... judge is ordinarily in a much better position to understand the circumstances surrounding the alleged misconduct and to evaluate its impact.' United States v. Tham, 665 F.2d 855, 860 (9th Cir.1981)" [, cert. denied, 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 466 (1982)]. Wysinger v. State, 448 So.2d 435, 439 (Ala.Cr. App.1983). The statements of a prosecutor will justify the reversal of a conviction only if they undermined "the fairness of the trial and contributed to a miscarriage of justice." United States v. Obregon, 893 F.2d 1307, 1310 (11th Cir.), cert. denied, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990) (quoting United States v. Sawyer, 799 F.2d 1494, 1507 (11th Cir.1986) (per curiam), cert. denied, 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987)). "`There is no legal standard by which the prejudicial qualities of improper remarks of a solicitor in the trial of a case *1033 can be gauged. Each case must be determined on its own merits.' Smith v. State, 282 Ala. 268, 291, 210 So.2d 826, 848 (1968). `Prosecutorial misconduct is a basis for reversing an appellant's conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.' United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989), cert. denied, 493 U.S. 1080, 107 L.Ed.2d 1041, 110 S.Ct. 1136 (1990)." Carroll v. State, 599 So.2d 1253, 1268 (Ala.Cr.App.1992), affirmed, 627 So.2d 874 (Ala.1993).

D.
Hunt contends that the trial court committed reversible error in denying his motion to dismiss on the ground that "one of his defense attorneys, Honorable John E. Grenier, was called as a witness before the Montgomery County Grand Jury and produced twelve boxes of Hunt's confidential files to the Grand Jury while a member of Hunt's defense team." Hunt's brief at 82.
In Graddick v. State, 408 So.2d 533, 544, 546 (Ala.Cr.App.1981), cert. quashed, 408 So.2d 548 (Ala.), cert. denied, 458 U.S. 1106, 102 S.Ct. 3483, 73 L.Ed.2d 1366 (1982), this Court recognized that "[t]he Sixth Amendment protects attorney-client communications," and noted that "[i]n cases where the attorney-client relationship has been violated and confidential information has been unlawfully disclosed to the government, the most recent cases have found dismissal of the indictment to be the only viable solution."
Here, the issues of whether and when John Grenier was acting as an attorney for Hunt are disputed factual issues. Grenier himself testified that, with the exceptions of a few occasions, he considered himself to be the a political consultant and not a lawyer for Hunt. In our opinion in Ex parte The Birmingham News Company, Inc., 624 So.2d 1117 (Ala.Cr.App.1993), this Court found that "[d]uring the pretrial hearings, the trial court found that Grenier dealt with Governor Hunt `in his capacity solely as head of the Hunt Inaugural Fund, Inc.,' i.e., as a political consultant and not as a lawyer (R. 1091), but that `there were definitely circumstances under which John Grenier was the lawyer for Governor Hunt.'" In connection with the 12 boxes of materials subpoenaed by the grand jury, Grenier testified that he "tried to make sure that there was nothing in it that would be protected by any attorney/client privilege." R.Vol. 28 at 343. Grenier even testified that he recommended that Hunt hire other lawyers to represent him in the criminal prosecution and that he did not consult with Hunt concerning the hiring of those attorneys.
Grenier testified that he did raise the attorney-client privilege before the grand jury:
"And the reason I did is because I take it that I wasit may be that although I was not acting as the Governor's lawyer I may have been looked upon as an agent of the governor in dealing with his lawyers who were Balch, Bingham and Bill Wasden and whether or not those communications would be protected by the attorney/client privilege in my capacity as the governor's political agent." R.Vol 28 at 327-30.
In Richards v. Lennox Industries, Inc., 574 So.2d 736, 739 (Ala.1990):
"The burden of establishing the privilege rests with the client or with the party objecting to the disclosure of the communication. See Harris v. State, 281 Ala. 622, 206 So.2d 868 (1968); see, also, Swain v. Terry, 454 So.2d 948 (Ala.1984). The client also has the burden of showing that the admission of the privileged information into evidence will be prejudicial to him. Swain v. Terry, supra. Whether a communication is privileged is `a matter solely within the province of the court to determine.' See, Ex parte Griffith, 278 Ala. 344, 178 So.2d 169 (1965), cert. denied, 382 U.S. 988, 86 S.Ct. 548, 15 L.Ed.2d 475 (1966). Because not every communication made by a client to an attorney is privileged, the trial court must first look at the circumstances of the case in connection with the fact disclosed and determine whether the communication was made `professionally' (i.e., whether it was made professionally is a question of fact for the trial court). Brazier v. Fortune, 10 Ala. 516 (1846). However, once that determination has been made, the trial court then *1034 determines whether, as a matter of law, the attorney-client privilege may be invoked. See 1 Thornton on Attorneys at Law § 96 (1914). Invocation of the privilege is solely the client's prerogative; therefore, the client may waive the privilege, either directly or constructively. See Swain v. Terry, supra."
Under Graddick, 408 So.2d at 546, "our inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting." See also Perry v. Leeke, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989) (state interference claims do not require a showing of actual prejudice to establish a Sixth Amendment violation).
"Whether or not a communication between a client and an attorney is privileged is a question of fact for the trial judge. Therefore, the party who asserts the privilege is not entitled to decide whether the privilege is available. Whether the party who asserts the attorney-client privilege is the attorney or the client, the party must establish (1) the presence of an attorney-client relationship, (2) the facts which demonstrate that the communications were within the privilege, and (3) the prejudicial effect to the client which would result from any disclosure of the privileged information."
Colquitt at § 5.2 at 162. The trial court ruled that as to the indictments which are the subject of the instant case, Grenier was not acting as Hunt's lawyer. That ruling is supported by the facts and by the application of the law to the facts, and will not be reversed on appeal. See generally Richards v. Lennox Industries, Inc., 574 So.2d at 739.
Furthermore, there is an additional reason why there was no misconduct on the part of the Attorney General in calling Grenier before the grand jury.
"The attorney-client privilege is not without bounds. It was established to protect lawful transactions between attorneys and their clients, and not to facilitate the commission of fraud or crimes. Therefore, the public policy which supports the attorney-client privilege is outweighed by the public policy against the perpetration of fraud and wrongdoing against others. The attorney-client privilege simply cannot be used to cloak wrongdoing. The protection afforded by the privilege is lost if the relationship is abused, such as where a client seeks advice from the attorney in an attempt to perpetrate a fraud."
Colquitt at § 5.2 at 163.
"The reason for this exception to the general rule is that if a client discloses his fraudulent purpose, and the attorney refuses to be connected with it, there cannot be said to be professional employment, and consequently no privilege accrues; if the client does not disclose his fraudulent purpose, there is no confidential relationship established, and no attaching privilege; if an attorney knowing the facts and fraudulent purpose agrees to aid in the perpetration of the fraud, he then becomes a party to it, and the communications made to him cease to be privileged."
Ex parte Griffith, 278 Ala. 344, 350, 178 So.2d 169, 176 (1965), cert. denied, 382 U.S. 988, 86 S.Ct. 548, 15 L.Ed.2d 475 (1966) (quoting 1 Thornton on Attorneys at Law § 96). See generally 8 Wigmore, Evidence § 2298 (McNaughton rev. 1961).

V. THE RIGHT TO A PUBLIC TRIAL
In a one-and-one-half page argument, Hunt contends that the trial court erred by allegedly denying him his "right to a public trial and hearing on all proceedings." He asserts that he "objected to any closed door proceedings [and] insisted that all motions, hearings, testimony, and all part of the trial proceedings be held in open court." Hunt specifies that his argument is directed to the closure of "the pre-trial proceedings." Neither Hunt nor the attorney general directs his respective argument to any specific pre-trial proceeding. We assume that Hunt is contesting the closure of the pre-trial proceedings that were the subject of the action of Ex parte Birmingham News Co., 624 So.2d 1117 (Ala.Cr.App.1993). Because obviously neither party has considered the specific nature of each proceeding to be necessary to the treatment of this issue and because of our ultimate disposal of this issue, we are not *1035 compelled to detail the myriad of topics discussed in those closed proceedings and conferences.
However, we consider it necessary to reiterate generally the procedural history of the related First Amendment issue presented to this court in Ex parte Birmingham News Co. The closed proceedings that were the subject of that action occurred during March 1993. On March 18, The Birmingham News Company, Inc., publisher of The Birmingham News; The Associated Press; and The Advertiser Company, publisher of The Montgomery Advertiser, filed in this court a petition for writ of mandamus seeking to compel the trial court to open the pretrial proceedings on the contention that the trial court was violating the First Amendment by denying the public and the press access to the pretrial hearings held in chambers.[5] The petition specifically requested that this court direct the trial court to (1) cease conducting closed proceedings without first complying with the requirements of Ex parte Consolidated Publishing Co., 601 So.2d 423 (Ala.), cert. denied, ___ U.S. ___, 113 S.Ct. 665, 121 L.Ed.2d 590 (1992), that the court first hear arguments against closure and make specific findings demonstrating that closure is essential to preserve higher values and that the closure order is narrowly tailored to serve those interests; (2) permit the news media to have access to the transcripts of the prior closed proceedings; and (3) unseal the court file. On that same date, this court ordered the trial court to comply with the requirements of Ex parte Consolidated Publishing Co. After the trial court filed its answer on March 22, this court entered an order on March 30, finding that (1) the trial court, "by the manner in which it ordered the closure of certain pretrial proceedings and the court file... violated the constitutional provisions of the First Amendment guaranteeing the public and the news media the right of access to criminal proceedings"; and (2) the trial court's March 22 answer was inadequate to meet constitutional requirements and the demands of Ex parte Consolidated Publishing Co., 624 So.2d at 1122. This court gave the trial court the options of either (1) immediately affording the news media access to the entire transcripts and court file of the prior closed proceedings or (2) holding a public hearing wherein the news media is allowed to present argument; specifying which portions of the prior proceedings transcripts and the court file are to remain closed or sealed; and preparing specific and detailed written findings with regard to each portion of the prior proceedings or court file that the court orders remain closed or sealed. Pursuant to this latter option, the trial court entered an order on April 9, 1993, releasing most of the court records and the transcripts previously ordered sealed and stating that those portions of records and transcripts that were to remain closed related to grand jury matters, to matters that are subject to the attorney-client privilege, or to plea negotiations. Hunt's trial started April 12 and concluded April 19.
A defendant's right to a public trial is guaranteed by the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." This right was held applicable to the states through the Fourteenth Amendment in In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682, 694 (1948). See also Argersinger v. Hamlin, 407 U.S. 25, 27-28, 92 S.Ct. 2006, 2008, 32 L.Ed.2d 530, 533 (1972). The Alabama Constitution of 1901 contains a similar guarantee: Art. 1, § 6, which provides that "in all prosecutions by indictment, [the accused has a right to] a speedy, public trial...." See also Rule 9.3(b), A.R.Cr.P., which provides, in pertinent part, that "[a]ll proceedings shall be open to the public, unless otherwise provided by law."
"The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions...."
In re Oliver, 333 U.S. at 270 n. 25, 68 S.Ct. at 506 n. 25, 92 L.Ed. at 693 n. 25 (quoting T. Cooley, 1 Constitutional Limitations 647 *1036 (8th ed. 1927)). In addition to ensuring that the trial court and prosecutor execute their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury, Waller v. Georgia, 467 U.S. 39, 46, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31, 38 (1984) (citing In re Oliver, 333 U.S. at 270 n. 24, 68 S.Ct. at 506 n. 24, 92 L.Ed. at 692 n. 24.
In Ex parte Birmingham News Co., 624 So.2d at 1123-24, this court noted the following:
"`The closure of a trial ... implicates both the defendant's Sixth Amendment right to a public trial and the public's First Amendment right of access.' Project, Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo.L.J. 853, 1388 (1993). See Ex parte Consolidated Pub. Co., 601 So.2d [at] 426-28..., briefly summarizing the development of the law in this area.... Th[e First Amendment] right is related to, but independent of, an accused's Sixth Amendment right to a public trial, `the common concern being the assurance of fairness.' Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 7, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1[, 9] (1986) (hereinafter `Press-Enterprise II'). [Footnote omitted.]"
"The right to a public trial, protected by the Sixth Amendment, has reached the Supreme Court more frequently as a matter of public access to the courts, or more particularly access by the press...." Joseph G. Cook, 3 Constitutional Rights of the Accused § 16.1, p. 29 (2d ed. 1986). See, e.g., Press-Enterprise Co. v. Superior Court of California, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (hereinafter "Press-Enterprise II"); Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (hereinafter "Press-Enterprise I"); Globe Newspaper Co. v. Superior Court for Norfolk County, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).
Not until Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), had the Supreme Court recently spoken on the closure of trial proceedings in the context of the Sixth Amendment. In Waller, the Court was called upon to determine "the extent to which a hearing on a motion to suppress evidence may be closed to the public over the objection of the defendant consistently with the Sixth and Fourteenth Amendment right to a public trial." Id. at 40-41, 104 S.Ct. at 2212, 81 L.Ed.2d at 35. In considering for the first time the extent to which the Sixth Amendment right extends beyond the actual proof at trial, the Waller Court considered the "right to access" or First Amendment cases to be "relevant precedents." Id. at 44, 104 S.Ct. at 2214, 81 L.Ed.2d at 37. In fact, the Court held that "under the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the tests set out in Press-Enterprise [I] and its predecessors." 467 U.S. at 47, 104 S.Ct. at 2216, 81 L.Ed.2d at 39 (footnote omitted). Accord United States v. De Los Santos, 810 F.2d 1326, 1333 (5th Cir.), cert. denied, 484 U.S. 978, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987). The Court explained that, while the analysis in these preceding cases has proceeded largely under the First Amendment, "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." 467 U.S. at 46, 104 S.Ct. at 2215, 81 L.Ed.2d at 38.
Because the contention of a Sixth Amendment violation is judged by an analysis gleaned from First Amendment cases and because the protections accorded by each amendment are coextensive, we consider our holdings in Ex parte Birmingham News Co. to be dispositive of the issue of whether Hunt was erroneously denied his right to a public trial by the closure of those portions of the hearings, the transcripts of which remain sealed after the trial court, on April 9, ordered the release of the bulk of the previously sealed transcripts and records. This court held that "[w]ith one minor exception[, the sealing of one line], we find the trial court's order continuing the sealing of materials concerning the grand jury proceedings to be `narrowly tailored' to preserve the `higher *1037 interests' of maintaining grand jury secrecy and protecting the on-going investigation." 624 So.2d at 1129 (footnote omitted). This court further found that, although the trial court erred in closing portions of the pre-trial hearings on its rationale of safeguarding the attorney-client privilege and protecting Hunt's Sixth Amendment right to counsel, those portions of the transcripts remaining under seal on that erroneous rationale properly remain sealed because they also "involved extensive use of grand jury testimony and other grand jury information." Id. at 1130. In regard to the portion of hearing exhibit 96 that remains sealed, we reiterate that "we have been provided with no indication of which portion of those 104 pages remains under seal [and] there has been no specific objection to the closure of any portion of that particular exhibit." Id. at 1131. In regard to the trial court's continued closure of a brief exchange of remarks between the court and counsel concerning plea negotiations (p. 930, lines 24-25; p. 931, lines 1-2, 4-8, 20-25; and p. 932, lines 1-4, 8-9),[6] we ordered that these comments be opened. However, because "[t]hose portions reveal no more than that information disclosed at the `settlement conference,' which, with the exception of two lines involving the grand jury testimony of John Grenier (page 652, lines 19-20), the trial court `opened,'" id. at 1131, we consider that error, if any at all, is so slight that it calls for no remedy. We find likewise in regard to the sealed state's response to Hunt's objection to compelling plea discussions and the sealed order sealing filings concerning plea discussion, which we ordered unsealed in Ex parte Birmingham News Co. In summary, we find, as we concluded in reviewing the same portions of transcripts and records remaining under seal under the First Amendment, that "all of the items with the exceptions we have identified, relate to matters that we have held are `higher interests' sufficient to justify the sealing of the items" and that "[t]he trial court's order is `narrowly tailored to serve th[ose] interest[s]' and, with the exceptions we have identified, we find no abuse of discretion in that order." Id. at 1132. Accordingly, we find that Hunt has not been erroneously denied his right to a public trial by the closure of those portions of the pre-trial proceedings that remain closed and by the sealing of those records that remain sealed.
Thus, we are left to reckon with the closure of those pre-trial proceedings, the transcript of which the trial court released by the pre-trial order of April 9, and with the sealing of those records that the trial court also subsequently released by the April 9 order. We need not determine whether Hunt had a Sixth Amendment right to public hearings on the vast array of topics discussed in the pre-trial chamber proceedings nor do we need to consider whether that right was justifiably violated in each instance. Assuming arguendo that Hunt, in each instance, did have a right that was violated, we consider that such error has already been remedied or cured. While the Waller Court observed that "the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee," 467 U.S. at 49, 104 S.Ct. at 2217, 81 L.Ed.2d at 40 (footnote omitted), it stressed that "the remedy should be appropriate to the violation," id. at 50, 104 S.Ct. at 2217, 81 L.Ed.2d at 41, and thus does not necessarily entail a new trial.
We find support for this conclusion in United States v. Valenti, 987 F.2d 708 (11th Cir.), cert. denied, ___ U.S. ___, 114 S.Ct. 289, 126 L.Ed.2d 238 (1993). There, the court addressed the question presented by the St. Petersburg Times (hereinafter "Times"), as an intervenor, of whether "the district court erred in conducting closed [pre-trial] proceedings without first providing the public and press notice and opportunity to be heard, and articulating specific findings that justified closure of portions of the underlying criminal proceeding," id. at 711. The closed proceedings consisted of a partially ex parte, closed bench conference between the prosecutor and the court, which resulted in a postponement of the trial date; two ex parte, in camera motions by the government; the *1038 government's in camera motion; a closed conference; a closed bench conference in open court; two ex parte, closed bench conferences with the government; three closed bench conferences; an in camera proceeding where the court heard testimony of an Assistant United States Attorney; and an in camera motion that the government filed seeking protection of discovery materials. Id. at 710-11. The procedural history of this case developed much like that of the case before us. On the day following the last of these closed hearings, the press filed an emergency motion to intervene and unseal transcripts of the previously held closed proceedings and several in camera documents. Approximately 10 days later, the district court denied that part of the motion seeking to unseal court records. In this order, the court attempted to satisfy the requirements of the First Amendment case law.
The Valenti court set forth the controlling First Amendment principles, particularly the following procedure:
"[I]n determining whether to close a historically open process where public access plays a significant role, a court may restrict the right of the public and the press to criminal proceedings only after (1) notice and an opportunity to be heard on a proposed closure; and (2) articulated specific `findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'"
Id. at 713 (quoting Press-Enterprise I, 464 U.S. at 510, 104 S.Ct. at 824, 78 L.Ed.2d at 638). The court also relied upon Newman v. Graddick, 696 F.2d 796 (11th Cir.1983).
In response to the Times's argument that the lower court completely disregarded the Press-Enterprise I and Newman procedural requirements before conducting the closed proceedings, the government contended that the lower court properly exercised its traditional authority to conduct bench conferences, especially where closure protects sensitive information concerning an ongoing criminal investigation, and that the court's subsequent hearing and order on the Times's motion was adequate to satisfy the principles of Press-Enterprise I and Newman. Id. at 713. In answering these contentions, the court stated the following:
"Contrary to the Times's argument, we do not interpret Press-Enterprise I to require a trial court to articulate findings that a closed bench conference is necessary and narrowly tailored to preserve higher values before a closed bench conference occurs. Instead, Press-Enterprise notes that a court may conduct an in camera conference on the record where the `constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time.' Press-Enterprise I, 464 U.S. at 512, 104 S.Ct. at 825[, 78 L.Ed.2d at 640]. In this process, the trial court balances the right of access against the interest in maintaining a sealed transcript. Press-Enterprise I, 464 U.S. at 512, 104 S.Ct. at 825[, 78 L.Ed.2d at 639]. In placing a duty on the trial court to balance competing interests and make findings after the occurrence of a closed bench conference, the Court in Press-Enterprise I articulated a workable procedure to accommodate the public's right of access and the long recognized authority of a trial court to conduct bench conferences outside of public hearing. See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 609 n. 25, 102 S.Ct. 2613, 2620, n. 25, 73 L.Ed.2d 248[, 259 n. 25] (1982) (holding that a trial court has traditional authority to conduct in camera conferences); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 598 n. 23, 100 S.Ct. 2814, 2839 n. 23, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring) (stating that `the presumption of public trials is, of course, not at all incompatible with reasonable restrictions imposed upon courtroom behavior in the interest of decorum,' including the exclusion of the public and the press from conferences at the bench and in chambers where such conferences are distinct from trial proceedings); United States v. Gurney, 558 F.2d 1202, 1210 (5th Cir.1977) (holding that `bench conferences between judge and counsel outside of public hearing are an established practice, ... and protection of their privacy is generally within the court's discretion.... Such *1039 conferences are an integral part of the internal management of a trial, and screening them from access by the press is well within a trial judge's broad discretion'), cert. denied, Miami Herald Publishing Co. v. Krentzman, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978), overruled in part on other grounds, Nixon v. Warner Communications, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Thus, we find no error in the district court's exercise of its traditional authority to conduct closed bench conferences. Our holding on this issue is bolstered in this case because the district court afforded the Times an opportunity to be heard on the release of the transcripts within a reasonable time.*
"* Our holding also provides a workable method and a common sense solution to the closure problem. After all, a trial judge cannot rule intelligently until some information has been disclosed."
Id. at 713-14 (emphasis in original). Although this explanation is based on the public's First Amendment right to access rather than on the defendant's Sixth Amendment right to a public trial, as we explained above, we find such case law to be of considerable significance to Sixth Amendment analysis. See also Gannett Co v. DePasquale, 443 U.S. at 393, 99 S.Ct. at 2912, 61 L.Ed.2d at 629-30 wherein the Court, in finding that the First and Fourteenth Amendment had not been violated by the closure of a pre-trial suppression hearing, emphasized that any denial of public access was only temporary, because once the danger of prejudice had dissipated, the trial court had made available a transcript of the suppression hearing; thus, the press and the public had a full opportunity to scrutinize the suppression hearing; and, therefore, unlike the case of an absolute ban on access, the press had the opportunity to inform the public of the details of the hearing accurately and completely.
We consider the observation of Valenti's "workable solution" in the case before us to have satisfactorily accommodated any Sixth Amendment right that Hunt may have had in any of the closed pre-trial proceedings. Under the facts before this court, the only reasonable alternative was the release of a redacted version of the sealed transcripts and records. References to grand jury matters permeated the entire pre-trial proceedings. We believe that redaction in this case was the only alternative to achieve the objectives of placing the bulk of the proceedings before the public and, thus, of safeguarding Hunt's Sixth Amendment right to a public trial to the extent allowed by the circumstances and nature of the pre-trial proceedings. See In re Dallas Morning News Co., 916 F.2d 205, 206 (5th Cir.1990) (wherein the court found that, when closure is ordered for voir dire proceedings, "[a] transcript should be made of such closed proceedings, with a determination later to be made by the district court as to whether certain portions of the transcript should be released or redacted for public dissemination"). The pre-trial proceedings, to the extent required by the Sixth Amendment, were open to be fully and accurately scrutinized by the public prior to trial. To grant Hunt a new trial under these circumstances would "be a windfall for [Hunt], and not in the public interest." Waller, 467 U.S. at 50, 104 S.Ct. at 2217, 81 L.Ed.2d at 41. Accordingly, we find Hunt's issue to be without merit.

VI. SUFFICIENCY OF THE EVIDENCE
Hunt argues that the State failed to prove a prima facie case of a violation of Ala.Code 1975, § 36-25-5.
In Chandler v. State, 615 So.2d 100, 107-08 (Ala.Cr.App.1992), cert. denied, 615 So.2d 111 (Ala.1993), this Court stated:
"`A primary objective of the Code of Ethics is that governmental officials avoid recurring situations in which there is a temptation to place personal gain, economic or otherwise, above the discharge of their fiduciary duty to the public. There is nothing new or startling about this concept. The avoidance of the appearance of impropriety is an ethical norm which has governed the conduct of attorneys and judges for decades. Certainly, there is nothing to prevent the Legislature from extending the application of this norm to all the branches of the government. Indeed, *1040 this is precisely what the Legislature intended....'

"Zerweck v. State Commission on Ethics, 409 So.2d 57, 60-61 (Fa.Dist.Ct.App.1982). See also Leffingwell v. Lake City, 257 Iowa 1022, 135 N.W.2d 536, 539 (1965)."
The guidelines to be used by an appellate court in determining the sufficiency of the evidence presented at trial was stated by the Alabama Supreme Court in Powe v. State, 597 So.2d 721, 724 (Ala.1991), as follows:
"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). Furthermore, a judgment of conviction will not be set aside on the ground of insufficiency of the evidence unless, allowing all reasonable presumption for its correctness, the preponderance of the evidence against the judgment is so decided as to clearly convince the reviewing court that it is wrong and unjust. Jackson v. State, 516 So.2d 726 (Ala.Crim.App.1985)."
In Issue III of this opinion, this court determined that the transfer of $11,700, made on December 29, 1989, from account # XXXXX-X at the Cullman Savings and Loan Association to Hunt's personal checking account at AmSouth Bank constituted an act which occurred within the time period for the application of the statute of limitations for this offense. Because the statute of limitations is jurisdictional, Cox v. State, 585 So.2d at 193, Hunt may only have been adjudged guilty pursuant to his conduct in making this final transfer. See Griffin v. State, 352 So.2d 847, 851 (Ala.1977) ("Proof as to the falsity of every pretense is not needed. Beasley [v. State, 59 Ala. 20 (1877)]. It is sufficient to prove so much of an indictment as shows that the defendant has committed a substantial offense specified therein").
The record indicates that this transfer was made from account # XXXXX-X which had been opened at the Cullman Savings and Loan Association. This account had been opened with a $100,000 check from the Friends of Guy Hunt account at Union Bank and Trust. The funds in this account had been raised for the purpose of implementing Hunt's transition into government and for his inauguration. The cashier's check, which served as the vehicle for this transfer, was made payable to Guy Hunt or Mrs. Guy Hunt. The deposit of this money into Hunt's personal account at AmSouth Bank made possible the withdrawal by a check which was immediately drawn on Hunt's personal account to make a payment to the Merchant's Bank on a note and mortgage on Hunt's farm. Thus, Hunt, after having been elected Governor of the State of Alabama, solicited funds for his transition into office and inauguration through a tax exempt non-profit corporation entitled the Hunt Transition and Inaugural Fund, Inc., and thereafter used part of those funds on December 29, 1989, to make a payment on a note and mortgage on his farm. This payment clearly resulted in direct personal financial gain to Hunt. This transfer also resulted in direct personal financial gain to Hunt's wife, as co-payee on the cashier's check and co-signee on the note and mortgage on the farm; as well as direct personal financial gain for "any business with which" Hunt was associated, specifically his farm.
The state also presented evidence of a number of transfers and financial transactions by Hunt involving various bank accounts, using funds which were raised through the tax exempt non-profit corporation. These prior acts were properly admitted at trial as they fell under the plan, scheme, design, and intent exceptions to the exclusionary rule which prevents the introduction of collateral criminal acts for the sole purpose of suggesting that Hunt is more likely to be guilty of the crime in question. See Mothershed v. State, 596 So.2d 47, 48-49 (Ala.Cr.App.1991). The admissibility of these other financial transactions is not raised as an issue on appeal.
Hunt's prior transfer of some of the funds raised for the purpose of the transition and the inauguration, as well as his expenditures of those funds, were relevant to prove a plan, design, scheme, or system in the acquisition *1041 of the direct personal financial gain by Hunt through the use of his public office. Hunt's identity was at issue in this case in that part of his defense was that his staff members handled the financial matters, and he was not a participant to the transfers. Therefore, the state's evidence that Hunt personally delivered the three $100,000 checks to the accounts in Cullman, as well as his usage of that money, was relevant. See Robinson v. State, 528 So.2d 343, 348 (Ala.Cr.App.1986); Brooks v. State, 562 So.2d 601, 603 (Ala.Cr. App.1989), reversed on other grounds, 562 So.2d 604 (Ala.1990).
The issue of intent was also in question, as Hunt asserted that he did not intend to use his public office to acquire direct personal financial gain, but rather viewed the funds as reimbursement for debts that he had incurred during the course of his political campaigns for public office.
"Evidence which pertains to an accused's motive or intent to commit the presently-charge offense is admissible as an exception to the general exclusionary rule applying to collateral acts or offenses. Nelson v. State, 511 So.2d 225, 236 (Ala.Cr.App. 1986), aff'd, 511 So.2d 248 (Ala.1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); Dyess v. State, 418 So.2d 208 (Ala.Cr.App.1982); Terry v. State, 397 So.2d 217 (Ala.Cr.App.), writ denied, Ex parte Terry, 397 So.2d 223 (Ala. 1981). See also C. Gamble, McElroy's Alabama Evidence § 69.01(7) (3rd 2d.1977). `Moreover if the accused's commission of another crime is admissible in a present prosecution, the State may prove in meticulous detail the manner in which the accused committed such other crime.' (Citations omitted.) Nelson, supra at 234."
Coleman v. State, 552 So.2d 156, 158 (Ala.Cr. App.1988). See also Karr v. State, 491 So.2d 1073, 1075 (Ala.Cr.App.1986).
Moreover, in the present case, the probative value of the evidence of these prior transactions was not "substantially outweighed by the danger of unfair prejudice...." United States v. Bailleaux, 685 F.2d 1105, 1111 (9th Cir.1982). See Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App. 1985); Turner v. State, 610 So.2d 1198, 1199-1200 (Ala.Cr.App.1992).
Here, the evidence supports the jury's verdict that Hunt was guilty of violating Ala. Code 1975, § 36-25-5. The state's evidence shows that Hunt used his position on December 29, 1989, after having been elected Governor of the State of Alabama, to obtain a direct personal financial gain, specifically $11,700, which he used as a payment on a note and mortgage on his farm.

VII. VENUE
This case was tried in Montgomery County, Alabama by a jury of citizens of that county. Hunt contends that the circuit court erred in denying his motion for a change of venue to remove this case from Montgomery County, Alabama, to Cullman County, Alabama.

A.
Although Hunt asserts that his residence was in Cullman County while he was governor, Art. V, § 118 of the Alabama Constitution of 1901, provides in pertinent part that:

"The governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, and commissioner of agriculture and industries, ... shall, except the lieutenant governor, reside at the state capital during the time they continue in office, except during epidemics." (Emphasis added).
Thus, the constitution requires the governor of Alabama to reside in Montgomery, Alabama, while he holds the office of governor. The jurisdiction and venue of actions under the Ethics Act are provided for in Ala.Code 1975, § 36-25-27(d), which states that:
"(d) The circuit courts of this state shall have jurisdiction of all cases and actions relative to violations or the enforcement of this chapter, and the venue of any action under this chapter shall be in the county of the residence of the defendant." (Emphasis added).
*1042 The provision of the cornerstone of our state law, the Alabama Constitution, is too clear to require interpretation. The venue provision of the Ethics Law is too clear to require statutory construction.
Furthermore, civil case law in Alabama also provides that a public official must be sued in the county of his official residence. In a 1961 case involving a lease in which the state of Alabama was a party, a complaint was filed against then Governor James E. Folsom in his official capacity as Governor of Alabama. Addressing the issue of venue, the Alabama Supreme Court has stated: "We think it is well established in Alabama, as well as elsewhere, that suits involving public officials are properly maintained in the county of their official residence." Tri-State Corp. v. State, 272 Ala. 41, 128 So.2d 505, 509 (Ala.1961).
In Ex parte City of Birmingham, 507 So.2d 471, 474 (Ala.1987), our Supreme Court mandated that civil suits be brought in the county of a public official's official residence stating: "Agencies and officers of the state must be sued in the county of their official residence absent specific statutory authority to the contrary or waiver of objection to venue." (Emphasis in original).
While Hunt cites cases in support of his contention that his domicile is elsewhere, the cases he cites are civil cases not involving public officials.
The venue provision of the Ethics Act, read in conjunction with the state constitution, requires that a prosecution for an Ethics Act violation by the governor be brought in Montgomery County, Alabama, the official residence of the governor.
The circuit court did not err in refusing to transfer Hunt's case to Cullman County, Alabama.

B.
Hunt contends that he did not receive a fair and impartial trial because of prejudicial pretrial publicity. He asserts that the trial court erred in denying his motion for a change of venue based on this theory. He contends that there was prejudicial pretrial publicity that resulted in "presumptive prejudice," and thus denied him an impartial jury.
The right of an accused to be tried by a fair and impartial jury is guaranteed by the Sixth Amendment of the United States Constitution which states that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." Article I, § 6 of the Alabama Constitution of 1901 states, in part: "That in all criminal prosecutions, the accused has a right to ... a speedy, public trial, by an impartial jury...."
The Supreme Court of the United States has held that if an accused can not obtain an impartial jury in the district where he is being tried then the court should transfer the case to another district where the jurors are free of bias. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). This guarantee has also been codified in this state in Ala.Code 1975, § 15-2-20. Rule 10.1, A.R.Cr.P. is to the same effect.
The yardstick by which this court measures the correctness of a trial court's ruling on a motion for change of venue is whether the trial court "abused its discretion" in denying the motion.
"The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial."
Nelson v. State, 440 So.2d 1130, 1132 (Ala.Cr. App.1983). See also Trahan v. State, 450 So.2d 1102 (Ala.Cr.App.1984). An appellant must prove a "gross abuse of discretion" before the trial court's ruling on a motion for change of venue will be reversed on appeal. Anderson v. State, 443 So.2d 1364 (Ala.Cr. App.1983).
In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated "actual prejudice" against him on the part of the jurors; 2) when there is *1043 "presumed prejudice" resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau, supra; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).
The "actual prejudice" standard is defined as follows:
"To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and `render[ed] a verdict based on the evidence presented in court.' Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756]."
Coleman v. Zant, 708 F.2d at 544.
Hunt does not allege that "actual prejudice" existed in this case. Instead, Hunt relies on the "presumed prejudice" standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: "Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held." 778 F.2d at 1490 (emphasis added). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr. App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
In determining whether the "presumed prejudice" standard exists the trial court should look at "the totality of the surrounding facts." Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is "rarely" applicable, and is reserved for only "extreme situations". Coleman v. Kemp, 778 F.2d at 1537. "In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice." Coleman v. Kemp, 778 F.2d at 1490.
Hunt had the burden of showing that "prejudicial pretrial publicity" saturated the community. Sheppard, supra. "[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one." Coleman v. Kemp, 778 F.2d at 1537. "Prejudicial" publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. "Publicity" and "prejudice" are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
From our review of the record, it is apparent that there was a great deal of media attention given to Hunt's prosecution and subsequent trial. A vast amount of publicity was presented by the media, both local and statewide concerning Hunt's case. A great deal of that publicity stated the fact of his indictment and what he was accused of doing. Hunt himself generated a significant portion of the media coverage he received through his frequent news releases to the media by his press secretary. In general, these news releases in general denied the charges. Public criticisms were exchanged by both Hunt and the Attorney General. Additionally, we note that there were rallies held within the community supporting Hunt's innocence.
Certainly there was widespread media coverage of the events surrounding this case. See state's print media exhibits; Clerk's record, Volume 1. Recognizing that this was the first time within memory that an Alabama governor had been indicted for a felony offense, we cannot state that the media coverage, *1044 although extensive, was unreasonable. In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, "the appellant must show more than the fact `that a case generates even widespread publicity.'" Oryang v. State, 642 So.2d 979, 983, (Ala.Cr.App.1993) quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
"`Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].'"
Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr. App.), cert. denied, 353 So.2d 35 (Ala.1977).
A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so "pervasively saturated" with prejudicial publicity so as to make the court proceedings nothing more than a "hollow formality." Rideau, supra. In fact, a great deal of media coverage tended to exonerate Hunt of the pending charges. Hunt's "excess campaign funds" or "political account" theory of defense received wide coverage.
Hunt cites Rideau, supra, and Coleman, supra, to support his contention that "presumed prejudice" existed. However, these cases are readily distinguishable from Hunt's case. In Rideau, the defendant had confessed to killing the victim in a video-taped interview with a sheriff. This confession was aired on television several times in the community where the crime and the trial took place. In Coleman v. Kemp, the defendant's half-brother had testified for the state in a previous trial involving a co-defendant. The details of that testimony, describing the horrible manner in which the defendant and the others murdered six people, were widely and repeatedly reported in the county in which the defendant was to be tried. Both Rideau and Coleman are examples of "extreme situations" which required a change of venue to secure a fair and impartial trial. The pre-trial publicity in this case did not remotely approach the intensity of the prejudicial pretrial publicity condemned in Rideau and Coleman.
The state further argues that the voir dire record in this case rebuts any finding of presumed prejudice. A review of that record is not essential in this case because Hunt does not contend that he has proved any "actual prejudice." However, we have reviewed the voir dire examination because, "[t]he appropriate method to establish the existence of adverse publicity or actual prejudice is through voir dire examination of potential jurors." Hart v. State, 612 So.2d 520, 527 (Ala.Cr.App.), affirmed, 612 So.2d 536 (Ala.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
Here the total venire was made up of 239 prospective jurors. The trial judge grouped the members of the venire into panels of 40. Each group of prospective jurors was first asked general questions by the trial judge concerning any pre-trial publicity. After general qualification, the remaining prospective jurors from that panel were individually voir dired by counsel for both sides in an attempt to avoid "tainting" the entire panel. From the first panel of 40, only one was removed after expressing a reservation about whether or not he could be unbiased towards Hunt. One was removed for biases against Attorney General Evans[7], and one was removed because of a mistake.[8] Of the remaining 37 prospective jurors, all but 2 had heard or read something about Hunt's case. Vol. 33 p. 244. However, on individual voir dire, the 12 jurors who were finally selected to hear the case each stated that he or she could disregard anything heard prior to trial, *1045 listen to the evidence presented, and make a fair and impartial judgment as to what the truth was.
As the Supreme Court, in Irvin v. Dowd, explained:
"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."
366 U.S. at 723, 81 S.Ct. at 1642-43, 6 L.Ed.2d at 756. "The constitutional standard of fairness requires that a defendant have `a panel of impartial, "indifferent" jurors.' Irvin v. Dowd, 366 U.S., at 722 [81 S.Ct., at 1642, 6 L.Ed.2d, at 755]. Qualified jurors need not, however, be totally ignorant of the facts and issues involved." Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Such a requirement is unreasonable. Considering the responses of each prospective juror during voir dire examination, we hold that there was no actual prejudice in this case.
Hunt has not met the test associated with the "presumed prejudice" doctrine. He has not proven that the community was so saturated with prejudicial publicity as to deny him a fair and impartial trial. Therefore, the trial court correctly denied Hunt's motion for change of venue on grounds of prejudicial publicity.

VIII. ALLEGED JUROR MISCONDUCT
Hunt contends that "the trial court commit[ted] reversible error in allowing the jurors while sequestered to have telephone contact with relatives and to have their ministers come to their motel rooms." Hunt asserts that this issue was presented to the trial court in his motion for a mistrial and in his motion for a new trial.

A.
During the trial at the beginning of the court session of Monday, April 19, 1993, the following occurred outside the jury's presence:
"THE COURT: Saturday, about ten o'clock when I got home I had a call, and a controversy had arisen about the jury couldn't decide where to go to church.... They all wanted to go to their own. Then there was a particular juror, Ms. L[.], whose husband was raising all sorts of cane and he wanted to be able to go to Mass and [Ms. L.] told him she didn't know if she could work that out, so forth and so on. So, I made the decision that there was no way for us to get them all to twelve different churches, so I allowed each one of themwith instructions not to talk about the caseto call, if they wanted to, to call their pastor and we made arrangements for the pastor or priest to come to the motel and pray with them, talk with them, give them communion, anything besides they couldn't say anything that touched or concerned on this matter. That's the way I handled that. Then I called the husband and the husband says he was very, very upset about the whole thing, and I told him I'd already worked that out and he calmed down.... I don't know that he's the one that (unintelligible). At this point in time, the normal procedure is that they monitor the phone call and let them touch base with their families, but I'm going to cut that off at this time. And the reason is another matter just got brought to my attention and that is that one of the juror's, either a child or somebody said that her name and address and everything was in the paper. That's all that she said, but I'm bringing all this to you folks' attention so you know what I know. That's where we are. I suspect that probably the one who (unintelligible) read something in the paper, but I don't know without asking him.
"MR. EVANS: Well, the question we have, Judge, is for the sanctity of the jury and the Court's orders. As I read the comment in the paper, it was made direct to editorial comments about the issues in this case and if he told the juror that he was in the paper then naturally it's just normal for somebody to want to know what their husband said in the paper and *1046 they're going to get it and read it, they're going to
"THE COURT: Well, they didn't actually get the paper.
"MR. EVANS: Direct editorial comment about the issues in the case. That's the concern.
"THE COURT: I'm seeking your guidance on how to handle where we are at this time. I want to hear what you've got to say.
"MR. EVANS: I would suggest that the Court, in camera, talk to whoever this husband is ... who was in the paper and then ask if you communicated any of this stuff to your wife that you reported in the paper, et cetera, et cetera, what you said....
". . . .
"MR. BECK: Judge, I feel like the entire rule for sequestering the jury might have been violated by allowing people to come I didn't know that was part of the policy, to receive phone calls. We're going to move for a mistrial on the grounds that we can't separate the prejudice. The jury has been tainted. That it would not help, but it would hurt to start interrogating these jurors and put them on the defensive. It would look like it was us being the bad guy, the heavy, when, in fact, it's something beyond our control and we respectfully ask for a mistrial.
"MR. EVANS: Judge, I don't feel it's necessary to move for a mistrial.... I think what this Court needs to do is to find the husband and ask, ... have you told your wife what you said in the paper? ...
"MR. BECK: Judge, we just think in camera proceedings adds to the problem. (Unintelligible) the only way to cure it is to start over and strike another jury.
"THE COURT: I'm not willing to declare a mistrial at this point, but what I would propose we do is just ask each juror to come back and ask them what, if anything, kind of phone calls they had received from family. I think
"MR. EVANS: One of the problems I think [Mr. Beck] and I have is that if either one of us asks questions it would hurt, so we ask the Judge to allow the counsel to draw up certain questions and give them to Your Honor and Your Honor to be guided by those questions.
"THE COURT: That's fine...." (Emphasis added).
After a brief recess called by the court to allow counsel to think about "what [they] might say or motions [they] might want to make," the following occurred:
"MR. EVANS: We have three questions that we've proposed, Judge, to be asked by the Court.
(Brief pause.)
"THE COURT: What have you got?
"MR. BECK: Judge, first, we want to make it clear we oppose any questioning of the jurors.... Without waiving that objection, the first part we object to the Court questioning these jurors and renew our motion for mistrial.
"THE COURT: Motion denied.
"MR. BECK: In addition to those
"MR. BURGESS: That would be the third question.
"MR. EVANS: May I see them, Judge?
"MR. BURGESS: There's a disadvantage on our side.
"MR. EVANS: No objections.
". . . .
"MR. EVANS: Judge, we would want the Court to [question the jurors] in camera.
"THE COURT: Why?
"MR. EVANS: Because some of your questions, some might invade the province of the jury itself and all the jurors are going to be sitting there listening to it.
"THE COURT: No. I'm going to have some general questions. If I get any positive answers from anyone, at that point in time I'm questioning that juror individually.
". . . .
"MR. FEAGA: I don't know how comfortable the juror is going to be
"MR. EVANS: To talk about their family in open Court.

*1047 "MR. BECK: Judge we just think that points out the problem. If you do it in camera it's intimidating; if the jury is tainted by not being sequestered
"THE COURT: I don't know if it is. That's what I'm going to find out.
"MR. EVANS: We would urge the Court to take time with each juror and go into keep the questions that we've got, but the State would urge the Court to do this in camera to make its own determination....
"MR. BECK: Well, he can't do itwe suggest he do it outside the presence of the lawyers and the Defendant.
"THE COURT: No."
After further discussion irrelevant to this issue, the court summoned the jury and in its opening remarks to the jury, the court stated the following:
"I know it's an inconvenience you being away from family and so forth, and we've allowed, with Court security monitoring your phone calls, to touch base to check with family and so forth with the instruction that you're not allowed to discuss the case in any way with them and they're not allowed to discuss it in any way with you.
"Just so we can start off fresh this morning, let me ask if any member of this jury's family, while you were talking with them, in any way, shape, form or fashion, mentioned any aspects of this case, whether it be a matter of a fact they may have seen in the paper or on TV, or a matter of opinion of somebody about the way this case is going or anything like that? ... No hands. Has any member of your family expressed any type of opinion about this case one way or another while you were talking to them on the telephone? Show me a hand, if so.
"Has any member of your family mentioned anything about anybody in the newspaper talking to them, or them talking to the newspaper? If so, would you show me a hand.
"All right. Then I think we're ready to get down to business, and we will continue to work with you in every way we can."
Thereafter, a defense witness was called for cross-examination.
The record shows that, at the time of the denial of the motion for mistrial, the trial court acknowledged only that it had allowed each juror, if he or she so desired, to call his or her pastor with the expressed instruction that there be no discussion about the case, and that arrangements had been made for a minister to come to the motel to address the spiritual needs of any juror, in the event that that juror so requested, with the further instruction that there be no discussion that would touch on or concern "this matter."
By this information, we cannot conclude that the court was aware or had been informed that any contact between a juror and a minister had actually occurred. In the hearing for the motion for new trial, the court indicated that it was unaware of any juror accepting the court's offer of pastoral visitation. Defense counsel's only allusion to any possible contact between a juror and a minister was in his sole objection even arguably asserting that specific issue: "Judge, I feel like the entire rule for sequestering the jury might have been violated by allowing people to comeI didn't know that was part of the policy, to receive phone calls." (Emphasis added). The entire remaining discussion about the mistrial motion concerned the jurors' telephone conversations with respective family members; the discussion made absolutely no referencespecific or impliedto any juror-minister contact.
Hunt asserts that upon these sole references, the prosecution bore the burden of showing that no injury resulted or could have reasonably resulted from any possible juror-minister contact and that because the prosecution failed to rebut the presumption of prejudice, the court erred in denying his motion. One of the cases upon which Hunt relies to support his argument is Reeves v. State, 432 So.2d 543, 547-48 (Ala.Cr.App. 1983), wherein this court stated the following:
"The presumption of prejudice arising from the separation of the jury during a trial arises only when that separation is unlawful. Annot. 72 A.L.R.3d 131, Section 21 (1976). A separation authorized or permitted by law will not create a presumption of prejudice to the accused. The rule is accurately stated in 72 A.L.R.3d at 168.

*1048 "`(A) separation of the jury during the progress of a criminal trial in violation of an applicable statute, rule, or order of court against separation, and under circumstances that might expose the jurors to improper influences, creates a presumption of prejudice to the defendant, placing the burden on the prosecution to show that no injury resulted, or could have reasonably resulted from such separation.'" (Emphasis added).
We find that the presumption of prejudice did not arise from the possible juror-minister contact because no actual contact was shown until motion for a new trial. The mistrial discussion merely showed, by the court's acknowledgement, that only arrangements for juror-minister contact had been made. Thus, no separation was shown. See, e.g., Hollis v. State, 37 Ala.App. 453, 455-56, 70 So.2d 279, 281 (1954) (the record did not sufficiently show an actual separation of the jury where the record contained the "meager recitals" that, after a short recess and "[w]hen the jurymen came back into the box, two were later returning than the others"; that the trial court then instructed the jurors not to separate; and that thereafter defense counsel made a motion for mistrial on the ground that the jury had separated).
Even if we assume for the sake of argument that the fact of a separation was adequately brought to the trial court's attention by Hunt's counsel's statement that the "rule for sequestering the jury might have been violated by allowing people to come," we would still conclude that the presumption of prejudice did not arise because it was not shown that the (possible) jury-minister contact was in violation of an applicable statute, rule, or order of the court against separation, as required by Reeves. From the record, we can conclude only that any contact, if made, had been authorized. The discussion of this matter during the trial offered absolutely no indication that any juror-minister contact unauthorized by the trial court had occurred.
Because no showing of unauthorized contact was made, the presumption of prejudice did not arise and accordingly, contrary to Hunt's argument, the prosecution did not bear the burden of proving that no prejudice might have resulted. We find support for this holding in Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, ___ U.S. ___, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), a case cited by Hunt. There, during the guilt phase of a capital murder trial, a bailiff took a juror to the jail on his way to taking her to her car to move it. With emphasis on the fact that the juror was accompanied by a bailiff, the court held that "there was not the kind of separation of the jury which raises a presumption of prejudice and which casts the burden upon the state to affirmatively show that no injury resulted to the defendant." Id. at 516.
Rather than the prosecution bearing the burden, the burden of proof remained with Hunt.
"If the trial judge has discretion, in the course of trial, to allow one or more jurors to separate, it will be presumed that the defendant is not prejudiced by any separation. In such case, the burden is on the defendant to prove that he was in fact prejudiced. If, on the other hand, a separation is apparently unauthorized, prejudice to the defendant will be presumed. In such case, the burden is on the prosecutor to prove that the defendant was not in fact prejudiced."
C. Torcia, 4 Wharton's Criminal Procedure § 479 at 93-95 (13th ed. 1992).
This general policy is reflected in Townsend v. State, 37 Ala.App. 357, 71 So.2d 117 (1953), cert. denied, 260 Ala. 700, 71 So.2d 118 (1954), where this court addressed the question of whether the trial court had properly denied a motion for new trial based on the ground that the court had erroneously allowed the jury to separate in a misdemeanor trial. After stating the rule that "during the progress of the trial of a misdemeanor it is within the discretion of the court to allow the jury to separate," id. at 359, 71 So.2d at 118, this court stated the following:
"Since the separation was permitted by the court in the exercise of its discretion, no presumption of injury would arise by the fact of such separation so as to cast upon the State the burden of affirmatively *1049 showing that no injury resulted therefrom. Error not being presumed the burden was upon appellant to establish it. Ala.Dig., Crim.Law, [Key No.] 1141(2). No showing was made by defendant that his rights were in any way prejudiced. In fact, no evidence at all was offered on the motion. No error resulted in the court's action in overruling the motion for a new trial."
Id. See also A.R.Cr.P. 19.3(a)(1) and (2) ("[i]n any prosecution for a capital felony, upon the consent in open court of the defendant, defendant's counsel, and the district attorney, the trial court, in its discretion, may permit the jury ... to separate," and "[this] separation of the jury ... shall create a prima facie presumption that the accused was not prejudiced by reason of the separation"); A.R.Cr.P. 19.3(b)(1) and (2) ("[i]n any prosecution for a noncapital felony, the trial court, in its discretion, may permit the jury trying the case to separate," and "[this] separation of the jury ... shall create a prima facie presumption that the accused was not prejudiced by reason of the separation"); Ala.Code 1975, § 12-16-9(a), and its predecessor, Tit. 30, § 97(1), Code 1940, which applied only to certain counties.
The cases upon which Hunt relies for the assertion that it was the prosecution who failed to successfully meet its burden concern circumstances wherein a statute or court order was violated i.e. an unauthorized separation. Several cases cited by Hunt concern separations violative of Tit. 30, § 97(1), Code 1940, which is applicable "only in the circuit court in counties having a population of 140,000 or more according to the last or any subsequent federal census" and which states in pertinent part the following:
"If the accused and his counsel and also the prosecuting attorney, in any prosecution for felony, whether capital or non-capital consent thereto in open court, the trial court in its discretion may permit the jury trying the case to separate during the pendency of the trial, whether the jury has retired or not. A separation so permitted shall not create a presumption of prejudice to that accused, but on the contrary it shall be prima facie presumed that the accused was not prejudiced by reason of the separation of the jury."
The cited cases that fall into this category are Chappelle v. State, 267 Ala. 37, 40, 99 So.2d 431, 434 (1957) (in addressing a juror's separation to go to the rest room, the court, citing Tit. 30, § 97(1), stated that "[w]hen a separation of the jury occurs, without the consent of the defendant, during the course of a prosecution for murder, upon proper motion by the defense for mistrial or a new trial, the burden is upon the state to show clearly that no injury resulted from the separation"); and Nelson v. State, 253 Ala. 246, 43 So.2d 892 (1949) (the court held that where the trial court allowed the jury to separate during the capital murder trial in accordance with an agreement between the prosecutor and defense counsel, but not with the appellant, and thus contrary to Tit. 30, § 97(1), the burden was upon the prosecution to clearly show that no injury resulted from such separation).
While the court in Smith v. State, 39 Ala. App. 501, 502, 105 So.2d 662, 663, cert. denied, 268 Ala. 694, 105 So.2d 666 (1958), noted that without the consent of the prosecution, the defendant or his counsel, the jury was allowed to separate at the close of the arguments, it did not explicitly rely on Tit. 30, § 97(1), to place the burden on the prosecution to overcome the presumption of prejudice. Rather, the court found that proof of a juror's breach of the court's admonition on separation triggered the prosecution's burden to show that the juror was not subjected to influences or contacts which might have influenced his deliberation. Id. at 505, 105 So.2d at 666.
This ruling of Smith v. State was recognized in Ex parte Troha, 462 So.2d 953 (Ala. 1984), another case cited by Hunt. In that case, the trial court denied the appellant's motion for new trial on the alleged ground of juror misconduct. In support of that motion, the appellant submitted the affidavit of a juror who professed to having called his brother, a minister, on the night of the first day of a two-day trial. The juror claimed to have called his brother because he is "a Christian and was quite upset and concerned that [his] actions as a juror were proper and *1050 just to include insurance that [he] adhere to Christian principles during [his] service as a juror." Troha, 462 So.2d at 953-54. This juror further admitted, by affidavit, that he had "discussed [his] situation with [his] brother and asked him for guidance and scripture references so as to enable [him] to make a proper and just decision." Id. at 954. The Troha court found the trial court's denial of the appellant's motion for new trial to be error. In so ruling, our supreme court did not address the factual circumstances in terms of an unauthorized separation; rather the court couched its discussion in terms of misconduct of a juror. We can certainly assume that the Troha juror breached the court's admonition on separation, as did the juror in Smith v. State. As in Smith, the proof of this breach of a court order (dictating the terms of a separation) triggered the prosecution's burden to show that the juror was not subjected to influences or contacts which might have influenced his deliberation. See Smith, 39 Ala.App. at 505, 105 So.2d at 666.
Two other cases cited by HuntJohnson v. State, 479 So.2d 1377, 1382 (Ala.Cr.App. 1985), and Beauregard v. State, 372 So.2d 37 (Ala.Cr.App.), cert. denied, 372 So.2d 44 (Ala. 1979)[9]deal with a violation of § 12-16-9(a), which states the following:
"If the accused and his counsel and also the prosecuting attorney, in any prosecution for a capital felony consent thereto in open court, the trial court in its discretion may permit the jury trying the case to separate during the pendency of the trial, whether the jury has retired or not. A separation so permitted shall not create a presumption of prejudice to that accused, but on the contrary, it shall be prima facie presumed that the accused was not prejudiced by reason of the separation of the jury."
In the capital murder case of Johnson, the trial court, without permission from either party, allowed a juror to go to his home to get his personal affects. In the capital murder case of Beauregard, officers either took the jurors in small groups or followed the jurors to their homes to allow them to get their clothes and take care of other business. In both of those cases, this court recognized that the prosecution had the burden to clearly show that no injury resulted from the jury separations. Johnson, 479 So.2d at 1382; Beauregard, 372 So.2d at 40.
In this case, we hold that because no unlawful separation was shown, the presumption of prejudice was not triggered. Thus, Hunt had the burden to prove that he was in fact prejudiced by any possible juror-minister contact. This burden was not met. At the hearing on the motion for a mistrial, it was not even established that there was a separation, much less an unauthorized separation. In this regard, we consider noteworthy the fact that defense counsel not only adamantly objected to any questioning about the jurors' telephone conversations, they, in no way at all, pursued the issue of juror-minister contact. See Ebens v. State, 518 So.2d 1264, 1267 (Ala.Cr.App.1986) (in finding "absolutely nothing of a prejudicial nature disclosed" by a telephone conversation between a juror and her friend about a mutual friend being the stepbrother of the deceased, the court noted that "defense counsel evidently found no implication of prejudice, since they chose not to pursue the alleged misconduct, as indicated by their declination to question the juror"). With this insufficient showing by Hunt, the trial court properly denied Hunt's motion for a mistrial in regard to possible juror-minister contact.
In regard to telephone conversations between jurors and their respective family members, we find that, based upon the general discussion above, Hunt again bore the burden to show an unauthorized separation, i.e. improper contact or influence. Again without a showing of unauthorized separation from which a presumption of prejudice would arise, Hunt bore the burden of showing prejudice. Again, Hunt failed to meet this burden.
*1051 However, even assuming arguendo that the defense met the burden of showing an unauthorized separation by the somewhat ambiguous colloquy concerning a juror's possible telephone discussion with a family member about a newspaper article, any presumption of prejudice was rebutted by the clear showing that no juror's relative made any reference to any aspect of the case during the telephone conversations and that all of each juror's portion of the conversations were monitored. See, e.g., Senn v. State, 51 Ala.App. 138, 283 So.2d 448, cert. denied, 291 Ala. 797, 283 So.2d 453 (1973) (where juror was permitted to telephone, in the presence of the sheriff, a hospital to find out about his mother's condition, the presumption of prejudice was overcome by evidence that the juror did not discuss the case with any outsider). Accordingly, we hold that the trial court properly denied Hunt's mistrial motion in regard to the juror-relative telephone conversations.

B.
During the hearing on Hunt's motion for new trial, Hunt again raised the trial court's allowing jurors to make telephone calls to respective family members while a bailiff was present and to receive visits by their respective clergy. In regard to the visits by clergy, the court stated the following:
"My information is thatand I'll state for the record so we can be clearis that I did issue, after a conversation, I think it was Saturday in the trial, direction to theto Court security that if any ... one of [the jurors] wanted to request that their pastor come and pray with them or preach them a sermon, that they would be allowed to come and be monitored by a member of Court security.... I didn't know how many of them it was...."
The parties thereafter stipulated that two jurors were visited by their ministers, and defense counsel maintained that, with that stipulation, the burden shifted to the prosecution to show that no injury resulted or could have reasonably resulted. In response, the prosecution argued that no juror had any unauthorized contact with a non-juror, and it emphasized that its stipulation supported no implication of "evil will or anything wrong in that or any misconduct." No evidence, except by the above noted stipulation, was introduced in support of Hunt's allegations.
Based on our discussion about the parties' respective burdens in the motion for mistrial proceedings, we find once again that Hunt failed to show any unauthorized separation, i.e., improper contact or influence. No evidence but the stipulation was introduced or even alleged in an offer of proof. The fact that two jurors met with their ministers did not satisfy Hunt's burden. The juror-minister meetings and the juror-relative telephone conversations were under strict instructions and were not unauthorized by the trial court. Without any showing that any instruction was breached, the trial court could not have properly assumed otherwise. Accordingly, we find that the trial court's denial of Hunt's motion for new trial was proper.

IX. THE JUDGE'S RECUSAL
Hunt argues that the trial judge erred by refusing to recuse himself, pursuant to Canon 3C(1)(a), Alabama Canons of Judicial Ethics, from ruling on the motions for new trial and for judgment of acquittal. Canon 3C(1)(a) provides that
"[a] judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
"He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."
Hunt also maintains that the trial judge should have recused himself because the judge engaged in ex parte communications in violation of Canon 3A(4), Alabama Canons of Judicial Ethics. That canon provides:
"A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested and impartial expert on the law applicable *1052 to a proceeding before him; provided, however, a judge should use discretion in such cases and, if the judge considers that justice would require it, should give notice to the parties of the person consulted and the substance of the advice, and afford the parties reasonable opportunity to respond."
Evidence presented at the hearing on motion for new trial established that sometime after the indictment and before the court's oral charge to the jury, the trial judge sought advice from two individuals, one James Anderson and one David Shropshire, without informing the parties or their attorneys in this case of the consultations.
The record shows that James Anderson is a lawyer in private practice in Montgomery, R. 10; the immediate past president of the Montgomery County Democratic Club; "the social and fundraising wing of the Montgomery County Democratic Executive Committee," R. 13; and the former Chairman of the Alabama Ethics Commission from October 1991 through October 1992, R. 11. At the time of the hearing on the motion for new trial, Anderson was Governor Folsom's attorney for "[e]thics matters that have been filed against" the new governor. R. 37.
David Shropshire is a member of a men's weekly prayer group to which the trial judge belongs. The group has been meeting for six years for Bible study and spiritual guidance. R. 59. Shropshire is the trial judge's "prayer partner." R. 59-60.
Anderson testified that about two or three weeks before the trial of this case, the trial judge stopped him in the hallway of the Montgomery County Courthouse and asked him "where in the law it said that you can or can't use campaign funds for your personal use." R. 21, 23. Anderson told the judge that the Fair Campaign Practices Act provided that campaign funds could be used for "any lawful purpose." R. 24. Anderson gave the trial judge his opinion that because the Act did not specifically proscribe the expenditure of campaign funds for personal use, there was no restriction on the spending of those funds for personal use. R. 24. The trial judge then asked "what if someone is soliciting ... campaign funds for an illegal purpose, [s]uch as, if they solicit campaign funds in violation of the Ethics Act?" R. 24. Anderson replied that "the Ethics Law says `unless otherwise authorized by law' and if the Fair Campaign Practices Act authorized you to do that, then it may make it a legal act." R. 25.
Anderson testified that it was his view, at the time he talked with the trial judge, "that excess campaign funds could be used for personal use." R. 31. He said that his conversation with the trial judge lasted "about three minutes," R. 40, and the issue of a jury charge was never discussed. R. 25.
David Shropshire testified that the trial judge discussed with him the fact that the lawyers in the Hunt case were having a disagreement about "where to sit." R. 61. He stated that the trial judge expressed his concern that settling the disagreement by drawing lots "might be gambling," R. 61, and that he asked Shropshire for a scriptural reference on gambling. Shropshire provided a Biblical reference by chapter and verse and then told the judge that he thought drawing lots would be "a legitimate way to make a decision." R. 61. Shropshire testified that the trial judge did not ask his advice on any other matter pertaining to the trial. After the verdict and sentencing, however, Shropshire asked the judge for and received a copy of the court's jury instructions and sentencing order. R. 63.
The exception to the rule that a judge should have no ex parte communications concerning a pending proceeding is that a judge "may obtain the advice of a disinterested and impartial expert on the law applicable to a proceeding before him." Canon 3A(4).
"The term `disinterested expert,' as used in Canon 3A(4), was interpreted for the first time in In re Judge C. 82.1 While presiding over a jury trial, the judge telephoned an attorney in the prosecutor's office who handled criminal appeals, and inquired as to the law governing certain jury instructions. To the judge's knowledge, the attorney had no direct involvement in the case at trial, and the judge believed that the attorney could give impartial legal advice. 82.2 The Alaska Commission held *1053 that the appellate prosecutor could not be considered a `disinterested expert' because he was visibly a part of the prosecution team. The Commission defined `disinterested expert' as one who "has no connection with any party or any participant in [the] lawsuit.
"82.1 Unreported Determination (Alaska 1990) (Author's note: Professor Lubet testified at the hearing on this matter as an expert witness on behalf of the respondent judge.)
"82.2 The judge disclosed the conversation to trial counsel for the prosecution and the defense. Id. at 7."
J. Shaman, S. Lubet, & J. Alfini, Judicial Conduct and Ethics § 6.07 at 37 (Michie 1990) (Supp.1993).
Even were we to find that the trial judge might reasonably have concluded that Anderson was a "disinterested expert" under the foregoing definition, Canon 2 of the Alabama Canons of Judicial Ethics states that a judge "should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." A judge should avoid not only impropriety but the appearance of impropriety. Commentary to Canon 2.
"The Canons are not merely guidelines for proper judicial conduct. It is well-settled that the Canons of Judicial Ethics have the force and effect of law."
Matter of Sheffield, 465 So.2d 350, 355 (Ala. 1984).
The fact that the trial judge's meeting with Anderson was brief and inadvertent did not dispel the appearance of impropriety created by the meeting. "[A] private interview or conversation between a judge and a ... non-party (where interests which might be affected by such conduct are not represented) could be deemed an impropriety and worthy of criticism." Stewart v. Stewart, 354 So.2d 816, 820 (Ala.Civ.App.1977), cert. denied, 354 So.2d 822 (1978).
The test for disqualification under Canon 3C(1) is: "Would a person of ordinary prudence in the judge's position knowing all of the facts known to the judge find that there is a reasonable basis for questioning the judge's impartiality?" Matter of Sheffield, 465 So.2d at 356; Ex parte Rives, 511 So.2d 514 (Ala.Civ.App.1986); Bryars v. Bryars, 485 So.2d 1187 (Ala.Civ.App.1986). Accord Parker v. Connors Steel Co., 855 F.2d 1510, 1524 (11th Cir.1988), cert. denied, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989) ("whether an objective, disinterested lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality"). In answering this question, we wholeheartedly agree with Hunt's argument that
"Judge Thomas was presiding over the prosecution of the first Republican governor since reconstruction brought by a Democratic Attorney General. Under such circumstances, given the fact that Judge Thomas chose to contact a known Democratic leader and former Chairman of the Ethics Commission which initiated the investigation of Governor Hunt, and who has since Governor Folsom took office been named as counsel for Folsom with regard to ethics charges against him, it [is] incredible that a reasonable person would not find at least the appearance of impropriety...."
Hunt's brief at 119.
We find that the trial judge's consulting Anderson with a legal question without giving all parties notice of the consultation and an opportunity to respond presented the appearance of impropriety. "[T]he practice of judicial consultation with experts without notice to the parties is fraught with dangers. Notice to the parties, as mandated by Canon 3A(4), largely eliminates these dangers while preserving the beneficial aspects of obtaining such outside help." Matter of Fuchsberg, 426 N.Y.S.2d 639, 648 (Ct.Jud.1978) (appellate judge held to have violated 22 NYCRR 33.3[a][4], which is virtually identical to Canon 3A(4), by consulting with law professors about cases pending before him).
Although the trial judge's consultation with Anderson may have "amounted to little more than informal solicitation[ ] for current thinking in a particular area of the law," "[i]t is important ... to emphasize that even this *1054 conduct was violative of the Canon and that the prescribed procedure of the Canon should be followed, if such solicitation of advice appear necessary." Matter of Fuchsberg, 426 N.Y.S.2d at 648 (emphasis added). "The very purpose of [Canon 3C(1)(a)] is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 865, 108 S.Ct. 2194, 2203-05, 100 L.Ed.2d 855, 875 (1988) (construing 28 U.S.C. § 455 which, like Canon 3C(1)(a), requires a judge to disqualify himself "if his impartiality might reasonably be questioned").
Based on the record that has been presented to this Court, it appears that the trial judge's conduct may very well have violated the Canons of Judicial Ethics. However, this finding does not mandate a reversal of Hunt's conviction. "In Liljeberg [v. Health Services Acquisition Corp., [486] U.S. at [858-62], 108 S.Ct. at 2202-03] the Supreme Court made it clear that harmless error analysis would be appropriate for a § 455(a) violation [the federal equivalent of Canon 3C(1)(a)]." Parker v. Connors Steel Co., 855 F.2d at 1527.
In Stewart v. Stewart, 354 So.2d 816 (Ala. Civ.App.), cert. denied, 354 So.2d 822 (Ala. 1798), the Alabama Court of Civil Appeals addressed a similar issue in which the trial judge had a conversation with a state investigator in the hallway next to the courtroom after the investigator had completed her testimony in the case. That court concluded that the judge's conduct was inappropriate:
"While the judge's discussions with the investigator may have constituted nothing more than a friendly chat or an effort by the judge to compliment the investigator on her report, the conversation was nonetheless ill-timed and unseemly. Indeed, the Alabama Canons of Judicial Ethics which were adopted by our supreme court in 1975 state that a judge should avoid even the appearance of impropriety in all his activities. Canon 2, A.C.J.E., Code of Alabama 1975. In this regard a private interview or conversation between a judge a witness or non-party (where interests which might be affected by such conduct are not represented) could be deemed an impropriety and worthy of criticism. See Canon 3 A(4), A.C.J.E., supra.
"However, merely because a judge's conduct is inappropriate, such conduct is not necessarily a sufficient ground for reversal by this court, particularly in the absence of a showing by the complaining party that the action taken by the court was inconsistent with substantial justice or materially prejudiced the complaining party. Rule 45, ARAP. See Kilgore v. State, 263 Ala. 606, 83 So.2d 315 (1955); Isom v. State, 51 Ala.App. 114, 283 So.2d 188, cert. den., 291 Ala. 523, 283 So.2d 194 (1973). Since the petitioner made no such showing in the present case, the trial court's decree will not be reversed on the basis of the conversation which took place between the trial judge and the investigator from the Department of Pensions and Security."
Stewart, 354 So.2d at 820
Although we strongly disapprove of the trial judge's having consulted Anderson and Shropshire in this case, we find that neither consultation resulted in harm to Hunt. Because the trial judge's communication with Anderson resulted in his receiving advice favorable to Hunt's position, the harm done by the communication was to the public's perception of the judiciary and not to Hunt.
Likewise, the harm done by the trial judge's conferring with his "prayer partner" Shropshire about how to settle a seating dispute among trial counsel was to the judiciary and not to Hunt. Without intending to disparage the trial judge's personal religious convictions, we point out that the public perception of judges as detached, impartial, and unbiased decision-makers is undermined when a judge improperly confers with an outsider on a matter which the judge alone is entrusted to decide. Upon learning of the trial judge's consultation with his "prayer partner" on the relatively trivial procedural matter of attorney seating arrangements, an objective observer might have reason to doubt the trial judge's ability to decide impartially those substantive, pivotal, and more highly-charged issues he is called upon to resolve.
*1055 For these reasons, we find that there is no reversible error present in the actions of the trial court.

X. ALLEGED CUMULATIVE ERROR
Hunt contends that the cumulative effect of the prosecutor's conduct, coupled with the conduct of the trial judge, rendered his trial "fundamentally unfair," requiring that his conviction be reversed. Specifically, Hunt argues that the Attorney General was acting pursuant to the singular goal of removing him from office by convicting him of a felony, and therefore, attempted to present Hunt in "a negative light" to the news media, both in and out of the courtroom.
Hunt specifically refers to the attorney general's conduct during trial in cross-examining Judy Pittman, a state's witness, for approximately eight hours. Hunt also argues that the attorney general attempted, through his cross-examination, to intimidate defense witness Norman Bishop by suggesting that Bishop had lied and was the subject of a state investigation.
Hunt also cites to certain comments made by the attorney general, which Hunt alleges served no purpose other than to prejudice the jury. Hunt complains that during the Attorney General's cross-examination of Judy Pittman, the Attorney General referred to a mythical inaugural ticket purchaser as "Daddy Warbucks" and made a reference to one of Hunt's supporters owning a Rolls-Royce automobile. In his closing argument the attorney general mentioned that the governor had the power to pardon persons condemned to capital punishment and commented that Hunt, as governor, failed to improve the educational systems in some areas of Alabama.
Hunt also complains that the Attorney General also commented that the Inaugural Committee was not a valid charity in that true charitable organizations are those in which people spend their lives in the inner city "where they've had a steady diet of alcohol, welfare, obscenity...." R. 1510. Hunt argues that the attorney general's comment during his closing arguments that "every criminal in every penitentiary in this entire county was convicted by a jury...." (R. 1434), minimized the state's burden of proof. Additionally, Hunt argues that Assistant Attorney General Feaga's statement that, "he's got to give you some evidence, if he wants you to buy off on that, that creates a reasonable doubt" was an unfair comment on Hunt's decision to exercise his constitutional right to refrain from testifying. R. 1421-22. Hunt concedes, however, that he did not object to this comment. Hunt urges that, in light of all of the other comments by the prosecutor, the cumulative effect was so prejudicial and damaging that reversal is required.
Hunt also cites as contributing to this prejudicial atmosphere, the conduct and rulings of the trial judge. Hunt specifically refers to the trial court's conduct in stopping the cross-examination of defense witness Judy Pittman in order to determine whether she was in need of legal counsel. Hunt contends that this was an indication that the trial court was biased and partial.
Hunt contends that the cumulative effect of the Attorney General's conduct and the conduct and rulings of the trial court rendered his trial fundamentally unfair.
Initially, Hunt contends that the Attorney General's conduct during cross-examination of defense witnesses Pittman and Bishop was improper.
"The keystone of our judicial system is the opportunity to cross-examine one's accuser. The scope of cross-examination of a witness is a matter controlled by law. Section 12-21-137, Code of Alabama 1975, states in pertinent part:
"`The right of cross-examination, thorough and sifting, belongs to every party as to the witnesses called against him....'
"See also Ala. Const. 1901, Article I, § 6:
"`... [T]he cross-examining party has the absolute right on cross-examination, not only to inquire as to matters relevant to the issues ... but also to inquire into the conduct and circumstances of the witness which have measurable bearing upon his credibility. This right to a party to have thorough and sifting cross-examination is provided by statute.'

*1056 "C. Gamble, McElroy's Alabama Evidence § 136.01 (4th ed. 1991)."
Scott v. City of Guntersville, 612 So.2d 1273, 1275 (Ala.Cr.App.1992).
The State argues that the reasons for the length of the cross-examination of Pittman were because the witness was eluding questions, failing to respond in a straights forward manner, and contradicting previous sworn testimony, all of which required further questioning. Due to the broad scope of permissible cross-examination, we hold that the trial court did not abuse its discretion by allowing the prosecutor to conduct his thorough and sifting cross-examination of defense witnesses.
Hunt contends that the Attorney General made impermissible prejudicial comments directed at him during cross-examination and during closing argument. While cross-examining a defense witness, the Attorney General did characterize a mythical potential purchaser of inaugural tickets as "Daddy Warbucks." During cross-examination of this same witness, the Attorney General asked her if she rode in James Wilson's Rolls-Royce when she traveled with him to Birmingham. The witness replied that she recalled that they travelled in his Mercedes. These comments were not directed at Hunt. They were directed at other individuals. For a prosecutor's comment to require reversal, the substantial rights of the accused must have been affected. Rule 45, A.R.App.P. Hunt's substantial rights were not violated here.
Hunt next contends that the following argument made in closing minimized the state's burden of proof:
"MR. FEAGA: I want you to remember something when you think about reasonable doubt. Every criminal in every penitentiary in this entire country was convicted by a jury
"MR. BECK: Your Honor, we object to that. Inflammatory.
"THE COURT: Argument.
"MR. FEAGA: Was convicted by a jury just like you beyond a reasonable doubt. A reasonable doubt is a real doubt based on the evidence, not on the speculation of lawyers."
In his brief, Hunt contends that the statement that every criminal in prison was convicted by a jury was an attempt by the state to minimize the reasonable doubt standard. Hunt did not raise this ground in his objection. We find that the prosecutor's statement, when considered within the context in which it was made, in no way minimizes the state's burden of proving guilt beyond a reasonable doubt.
Hunt also contends that the following statements made by Attorney General Evans in closing argument were prejudicial and warrant reversal.
"MR. EVANS: Let me tell you, there are good people in Alabama who work for genuine, bona fide charitable organizations. They spend their lives in it. Y'all ever been to the inner city and took a look at it? You see the real charities working down there with those people where they've had a steady diet of alcohol, welfare, obscenity
"MR. BECK: Your Honor, we object."
Shortly thereafter, the following occurred:
"[MR. EVANS]: And they're talking about the power of the state. Power of the state, power of the Attorney General. This man had human life weighing in his hands. One of the fifty most powerful men in America. And every condemned person who looked at capital punishment appealed to him for his life. He had the power to pardon.
"MR. BECK: You Honor, we object. This is inflammatory and has nothing to do with this case.
"MR. TRAVIS: This is objectionable.
"MR. EVANS: You Honor, they brought out the powers of the offices here and I'm just replying in kind.
"MR. BECK: It's improper argument.
"MR. EVANS: It's absolutely proper, Your Honor.
"MR. TRAVIS: Ask for a ruling.
"MR. BECK: Would you rule, Judge?
"MR. EVANS: He had the power
"MR. BECK: He overruled.

*1057 "MR. EVANS (continuing):
"He had the power with the stroke of a pen to change the lives of the people of Alabama with the stroke of a pen. Do you really believe what they showbilled as a charitable event, that's gonna be good for people? Educational needs. Have you ever been to the schools in Marshall County? Lowndes County? Have you ever been there?
"MR. BECK: Judge, we object to this.
"MR. EVANS: No, sir.
"MR. BECK: It's not a school funding case. It's inflammatory.
"MR. EVANS: Inference from this evidence, Your Honor.
"MR. BECK: There's no inference from that evidence.
"MR. EVANS: It's absolutely written down.
"THE COURT: Move on."
While we note that there was no adverse rulings obtained from the trial court, we nevertheless will discuss the merits of the issues raised.
Hunt contends that the only purpose for these comments was to prejudice the jury against him. However, we find that these comments were based upon legitimate inferences which could have been drawn from the evidence presented at trial or were made in response to comments made by Hunt's attorney during his closing argument.
The articles of incorporation of the Hunt Transition and Inaugural Fund, Inc. were introduced into evidence at trial. The articles include the following statements:
"Its purpose is to provide a non-profit organization to receive and administer funds provided by contributions, subscriptions and other sources to:
". . . .
"(e) promote or carry out other scientific, educational, civic, patriotic, political, historical, literary, religious, or charitable purposes as may be permitted by law...." (Emphasis added).
Two of the stated purposes of the Hunt Transition and Inaugural Fund were to provide money for educational and charitable purposes. The attorney general's comments concerning charities and the educational system were based on inferences from that evidence. The money from the fund could have been legally used for charitable purposes in inner cities or to help counties with poor educational systems.
"`Whatever is in evidence is considered subject to legitimate comment by counsel.'... `The prosecutor has the right to present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way.'"
Williams v. State, 601 So.2d 1062, 1072-73 (Ala.Cr.App.1991) (citations omitted).
Also, Mr. John McDaniel, co-counsel for the defense, made the following comments during closing argument concerning the power of the Attorney General's office:
"Sometimes, you know, when youwhen you're defending somebody, you look over here and you see the power of the State and you see the power of theof these lawyers here and they're all very good lawyers, very competent lawyers led by one of the best trial generals, I think, anywhere; and to some people, I think Monday or Tuesday you felt a little intimidated. And then I think of stories. I think of people like David. I think of situations like people that can stand up to things and to situations and fight for what they feel is right. So that isI'm not intimidated, then, at all by that power because I know in my heart that you people are gonna make your decision based on what comes from the witness stand and what the Judge tells you that the law is."
The attorney general's comments about Hunt's power as governor were in response to defense counsel's comments about the power of the attorney general. "`When the door is opened by defense counsel's argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.'" Williams, 601 So.2d at 1074. These comments made by the prosecutor were replies-in-kind to the comments made by defense counsel in his closing argument.
*1058 Hunt further contends that the statement "He's got to give you some evidence, if he wants you to buy off on that, that creates a reasonable doubt," was a comment on Hunt's failure to testify. Initially, we observe that this issue was not preserved for our consideration as no objection was made at the time that this statement was made.
"In a case in which there has been a direct reference to a defendant's failure to testify and the trial court has not acted promptly to cure that comment, the conviction must be reversed.... In a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error there must be a virtual identification of the defendant as the person who did not become a witness."
Ex parte Williams, 461 So.2d 852, 854 (Ala. 1984) (citations omitted).
Here the State merely commented on the failure of the defense to counter the state's evidence. This is a permissible area of argument by the prosecution in closing. Coral v. State, 628 So.2d 954, 986 (Ala.Cr.App.1992), affirmed, 628 So.2d 1004 (Ala.1993).
Hunt also contends that the trial court erred in interrupting the cross-examination of defense witness Judy Pittman in order to determine whether the witness personally needed an attorney. The record indicates that the trial court interrupted this cross-examination and sent the jury out of the courtroom when the witness indicated that certain people, with her knowledge and approval, had changed account numbers and deposited checks into accounts other than those into which they were made payable. The following transpired during the cross-examination of Judy Pittman:
"A: [I]t could go to Friends of Guy Hunt account.
"Q: I see. That positionthat
"THE COURT: Let's hold on just a second. Ladies and gentlemen, I'm going to ask y'all to step out for just a minute.
"(WHEREUPON, the following occurred out of the presence of the jury):
"THE COURT: I'm going to see if I can'tI want to make sure I understand something.
"Ma'am, did you open up the account originally?
"THE WITNESS: The original Inaugural account.
"THE COURT: What was the name of that account?
"THE WITNESS: It was the 1987 Inaugural Committee.
"THE COURT: Okay. If you had a check that came in with the payee's name 1987 Inaugural Committee and that's the payee and you've got a bank account right here that says 1987 Inaugural Committee and one over here that says Friends of Guy Hunt, which one are you going to put it in? The one to whom it's to be paid to? That's what I don't understand.
"THE WITNESS: Okay.
"THE COURT: You mean you're going to take a check made out to this account, straight to that payee, and put it in another named account? How are you going to do that? I mean, what was your basis for that?
"THE WITNESS: Well, the guidelines
"THE COURT: I mean, wouldn't that kind of be like taking a check made out to me and putting in Jimmy Evans's account?
"MR. BECK: Your Honor, with all due respect, she's trying to answer Your Honor's question.
"THE COURT: I'm trying to decide whether or not this witness needs to be
"MR. BECK: Be what Judge?
"THE COURT: Well, I may need to advise her of some rights. That's what I'm trying to decide. If she took part in taking from one payee and putting it in another account.
"MR. BECK: Well, Your Honor, you would not even let me go into why she did that in the guidelines on direct, but yet you let him cross her up and down the river on what these guidelines were. No wonder she's confused.
"THE COURT: Well, I need to find out what the guidelines were because maybe we need to

*1059 "MR. EVANS: Your Honor, may I speak for the record?
"MR. BECK: You've asked her, with all due respect, Your Honor, and I apologize, but I thought you asked a series of questions that I couldn't sit here and answer much less the witness.
". . . .
"MR. EVANS: The matter of the
"THE WITNESS: The guidelines allowedwell, a check, regardless of how who the payee is
"THE COURT: How did they decide to disregard the payee? I don't know. I'm asking you now. Do you know?
"THE WITNESS: I can't speak to that exactly, legally, or what section may address that, but in fund raising, frequently you have an organization that has several different fund raising activities and though the checks are made out to these different activities, they may all be put into the same account as one general fund, and the way the check is made out is just a way of keeping record of who contributed what. In this case, the guidelineswe did not want, as Mr.even a memo that was brought up, Mr. Pinckney's memo, stated that the corporate needed to be segregated from the political, um, account money. So, those checks, corporate checks were put in one account that is being called the T & I account, and then checks that qualified as political contributions such as checks from individuals and
". . . .
"THE COURT: At any rate, let's all take a five minute recess and bring the jury back in and go into this some more. I'm just trying to know who I can rule with some intelligence on the objections.
"THE WITNESS: Did I clear that up, you think?
"THE COURT: I'm not going to comment on that."
The trial court was attempting to understand and clarify the witness's responses in order to determine if she was in need of legal counsel to protect her constitutional right against self-incrimination. Furthermore, the discussion took place outside the presence of the jury. Hunt suffered no prejudice.
Last, Hunt contends that the cumulative effect of the above actions by the prosecutor and the trial court demand that this cause be reversed. "Where no single instance of alleged prosecutorial conduct constitutes reversible error, the cumulative effect of these instances cannot be considered to be any greater. Thomas v. State, 393 So.2d 504 (Ala.Cr.App.1981)." Mims v. State, 591 So.2d 120, 127 (Ala.Cr.App.1991). See also Allen v. State, 611 So.2d 1152, 1155 (Ala.Cr. App.1992); Carroll v. State, 599 So.2d 1253, 1269 (Ala.Cr.App.1992), affirmed, 627 So.2d 874 (Ala.1993); McMillian v. State, 594 So.2d 1253, 1262-63 (Ala.Cr.App.1991); Bates v. State, 574 So.2d 868, 873 (Ala.Cr. App.1990); Reynolds v. State, 539 So.2d 428, 431 (Ala.Cr.App.1988). We find that no single comment or incident referred to by Hunt or their cumulative effect constituted reversible error.
"`[A] defendant is entitled to a fair trial but not a perfect one,' for there are no perfect trials." Brown v. United States, 411 U.S. 223, 231-32, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208, 215 (1973) (quoting Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476, 484 (1968) quoting Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593, 604 (1953)). Our review of the record convinces this court that Hunt received a fair trial and that he is in fact guilty of the offense with which he was charged.
The judgment of the circuit court is affirmed.
AFFIRMED.
BOWEN, P.J., and TAYLOR, PATTERSON and McMILLAN, JJ., concur.
MONTIEL, J., recused.
NOTES
[1] "Per curiam" is defined: "By the court. A phrase used to distinguish an opinion of the whole court from an opinion written by any one judge." Black's Law Dictionary 1032 (5th ed. 1979). This opinion was written by no single judge. Each of the four participating judges on the Alabama Court of Criminal Appeals made significant contributions to each portion of this opinion. Judge Montiel, the fifth member of the court, served as legal advisor to Hunt and was appointed to his present position by Hunt. Judge Montiel has recused himself from these proceedings.
[2] This court further considers the issue of selective prosecution as a ground for dismissing the indictment in Part IV C of this opinion.
[3] Title 17, § 332, Code of Ala. 1940 provided:

"Any person or persons who do any act defined or declared to be a corrupt practice under the election or primary election laws of this state, or who wilfully fails or refuses to do any act required of such person under this chapter, relating to the corrupt practice law of this state, shall be guilty of a misdemeanor, and, on conviction, must be fined not more than five hundred dollars, and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than six months at the discretion of the court trying the case."
[4] Ala.Code 1975, § 13A-8-1(6) is in the chapter of the Alabama Criminal Code titled "Offenses Involving Theft." That section defines "obtains" to mean:

"a. In relation to property, to bring about a transfer or purported transfer of a legally recognized interest in the property, whether to the obtainer or another; or
"b. In relation to labor or service, to secure the performance thereof."
[5] The Alabama Press Association was later permitted to intervene.
[6] These page and line references are not to the transcript of the pre-trial proceedings submitted on this appeal, but are from that transcription of the proceedings that was presented for our review in Ex parte Birmingham News Co.
[7] A juror expressed biases against Attorney General Evans because one of his close friends had been prosecuted by the attorney general's office.
[8] A juror was excused because of an error made in summoning him to jury duty. It would seem from the record that he had been summoned by the court in place of his father.
[9] Although the Beauregard court made no mention of § 12-16-9(a), Code of Alabama 1975, we reach the conclusion that Beauregard involves a violation of that statute by virtue of the court's observation that "[n]o mention is made of any agreements for the jury to separate or of any local or special law permitting a temporary dispersal," 372 So.2d at 40.